## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ACUITAS CAPITAL, LLC,<br><br>                    Plaintiff,<br><br>     -against-<br><br>IDEANOMICS, INC.,<br><br>                    Defendant. | Case No. 1:23-cv-2124<br><br>**COMPLAINT** |

Plaintiff Acuitas Capital, LLC ("Acuitas Capital" or "Plaintiff"), by and through its undersigned attorneys, McDermott Will & Emery LLP, brings this complaint against Defendant Ideanomics, Inc. ("Ideanomics" or "Defendant"), and alleges as follows:

## INTRODUCTION

1.      This dispute arises out Ideanomics' breaches of its contractual obligations to Acuitas Capital.  Pursuant to a Securities Purchase Agreement dated as of November 14, 2022 (the "SPA"), Acuitas Capital invested $20 million in Ideanomics – cash that Ideanomics badly needed – in exchange for Series B Convertible Preferred Stock in Ideanomics (the "Preferred Stock") and warrants (the "Warrants" and, collectively with the Preferred Stock, the "Convertible Securities").

2.      The Convertible Securities were convertible into a certain number of shares of registered and freely transferable Ideanomics common stock using contractually agreed formulas. So that the stock issued to Acuitas Capital maintained its value and would not be diluted by further securities issuances for a certain time period, Ideanomics agreed to a restriction on its issuance of additional securities until after May 2, 2023.

3.     The capital infusion provided by Acuitas Capital was much needed by Ideanomics. Its stock had been trading at close to $5/share in February 2021.  However, by mid-November 2022, when the SPA was signed, the company's stock price had dropped to under $.28/share, was at risk of being delisted, and the company needed cash to fund its operations and business plans. Pursuant to the SPA, Acuitas Capital provided Ideanomics with a total of $20 million in three separate cash infusions – $5 million in November 2022, $5 million more in December 2022, and another $10 million in February 2023.

4.     Also in February 2023, Acuitas Capital twice exercised its right to convert some of the Preferred Shares into Ideanomics common stock by sending Ideanomics a "Conversion Notice" as provided by the SPA.  Ideanomics honored both Conversion Notices.

5.     However, the day after Acuitas Capital provided its final $10 million cash infusion, Ideanomics advised Acuitas Capital that, notwithstanding the funding just supplied by Acuitas Capital, Ideanomics was again running out of money and needed more "today" or else there would be dire consequences.  Ideanomics sought to terminate the SPA purportedly so that Ideanomics could pursue yet more financing.  The parties discussed a potential buy-out by Ideanomics of the remaining Convertible Securities but were unable to agree to terms.

6.     Ideanomics' offer was well less than the remaining Convertible Securities were worth and was based on a plainly incorrect reading of the Warrants' exchange formula.  When Acuitas Capital pointed out the error and noted that the same formula had been accepted and specifically enforced by a court, Ideanomics' General Counsel wrote to Acuitas Capital in an email on February 28, 2023, that she was not "particularly nervous about this making it to court" and "[t]he greater risk to you is that the warrants, and all stock, are valueless."  In other words,

Ideanomics' General Counsel all but admitted that, if Acuitas Capital did not agree to Ideanomics' terms, Acuitas Capital's securities would soon be worthless.

7.    On March 3 and March 6, 2023, respectively, Acuitas Capital sent Ideanomics two more notices (the "March Notices") seeking to convert Convertible Securities into common stock pursuant to the SPA.  This time, Ideanomics refused to honor either conversion request.

8.    Desperate to escape its contractual obligations, on March 7, 2023, Ideanomics' General Counsel sent Acuitas Capital a letter in which she claimed that the SPA was "null and void" because the Chief Executive Officer and Chairman of Acuitas Capital, Terren Peizer ("Peizer"), had been accused in an indictment unsealed on March 1, 2023, and in a companion complaint filed the same day by the United States Securities Commission ("SEC"), of insider trading involving a totally different company having nothing to do with Ideanomics.  Putting aside that Peizer denies the allegations against him and will vigorously defend himself, even if the allegations were true, they would neither render the SPA "null and void" nor excuse Ideanomics from complying with its contractual obligations to Acuitas Capital.

9.    Prompt relief is required because Ideanomics is, by its own admission, currently in an extremely precarious financial position.  According to its public securities filings, Ideanomics has "substantial doubt . . . about [its] ability to continue as a going concern" and "do[es] not have adequate cash to meet [its] short or long-term needs."  It appears that the only way that Ideanomics will be able to continue operations is to issue massive amounts of stock to fund itself, diluting existing shareholders, and effectively wiping out the value of Acuitas Capital's position in the company.  The SPA's restrictions on issuance of securities – which Ideanomics has already incorrectly claimed are "null and void" along with the rest of the SPA – expires on May 2, 2023.

10.     In other words, Ideanomics wants to keep the $20 million that Acuitas Capital invested in Ideanomics, ignore the "lock-up" provision protecting Acuitas Capital's investment from being promptly diluted, and otherwise deprive Acuitas Capital of the consideration that it received in exchange for its substantial investment in Ideanomics.

11.     If Ideanomics' gambit is successful in delaying or denying the issuance of registered Ideanomics common stock to Acuitas Capital, it will have no protections against having its position wiped out or diluted by the time the Court rules.  Thus, unless Ideanomics is ordered promptly to honor its contractual obligations with the only currency it has available to satisfy Ideanomics' contractual obligations – registered and freely transferrable common stock – there is a high probability that the Convertible Securities and Ideanomics common stock to which Acuitas Capital is entitled pursuant to SPA will be, as Ideanomics' General Counsel asserted, "valueless" at the conclusion of this litigation.

12.     The parties' contracts also contain clauses stating that Acuitas Capital will be irreparably harmed if Ideanomics does not comply with its conversion obligations.  Accordingly, as Ideanomics acknowledged in the contracts, Acuitas Capital has no adequate remedy at law and prompt injunctive relief is necessary.

**PARTIES**

13.     Plaintiff Acuitas Capital is a limited liability company registered in Delaware.  Its sole member is Acuitas Group Holdings, LLC ("Acuitas Holdings").  Peizer is the sole member of Acuitas Holdings.  Peizer is domiciled in Puerto Rico.  Acuitas Capital identifies "small cap" companies with high-growth potential and provides them with the capital needed to achieve their business objectives and create shareholder value.

14.     Defendant Ideanomics is incorporated in Nevada and has its principal place of business in New York, New York.  Ideanomics is a company that seeks to accelerate the

commercial adoption of electric vehicles, with a significant portion of its operations and assets located in mainland China. The company's "Mobility" business unit seeks to accelerate the commercial adoption of electric vehicles by developing solutions for supporting infrastructure (e.g., charging stations), while its "Capital" unit offers finance packages to operators seeking to make the transition to electric.

## JURISDICTION AND VENUE

15.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) as the controversy is between (a) a citizen of Puerto Rico and (b) a citizen of Nevada and of New York, and because Acuitas Capital seeks damages in an amount in excess of $75,000, exclusive of interest and costs. Acuitas Capital invested $20 million in Ideanomics in exchange for Convertible Securities. Acuitas Capital previously exchanged the first $10 million worth of Convertible Securities. Ideanomics' breach of the parties' contracts threatens to render the remaining $10 million worth of Convertible Securities worthless.

16.     This Court also has jurisdiction to hear the matters before it and venue is proper by agreement of the parties pursuant to New York Business Corporation Law § 1314, and/or New York General Obligations Law § 5-1402. Specifically, Section 10(a) of the SPA and states:

> Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or under any of the other Transaction Documents or in connection herewith or therewith or with any transaction contemplated hereby or thereby or discussed herein or therein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper.

Section 11 of the Warrants contains a similar provision.

17.    The parties also each agreed in the SPA and Warrants to waive their right to a jury trial.

## FACTUAL ALLEGATIONS

**Acuitas Capital Invests $20 Million in Ideanomics in Exchange for Convertible Securities**

18.    In October 2022, Acuitas Capital reached out to Ideanomics regarding making an investment in the company.  Ideanomics was seeking capital at the time, expressed interest, and the parties began negotiations.

19.    On November 14, 2022, Ideanomics and Acuitas Capital entered into the SPA, pursuant to which Acuitas Capital agreed to purchase the Convertible Securities for a total of $20 million in three separate tranches (each, a "Closing").  (SPA § 1.)  At the time that the SPA was signed, Ideanomics common stock (which is listed on the NASDAQ under the symbol IDEX) was trading at approximately $.28/share.

20.    The Preferred Stock was convertible into common shares of Ideanomics at a "Conversion Price" of the lowest of (i) $0.273, (ii) the closing price on the trading day immediately preceding the date on which the registration statement registering for resale the shares underlying the Preferred Stock is declared effective by the SEC, or (iii) if the registration statement registering for resale of the shares underlying the Preferred Stock was not declared effective by the SEC, the closing price on the trading day immediately preceding the date on which resales of such shares may be made pursuant to SEC Rule 144 (which allows for sales of securities without registration). (SPA Ex. C §§ 4(a), 6.)  In addition, the Preferred Stock had a liquidation and dividend preference. (*Id.* §§ 3-4.)

21.    The Warrants were convertible into common shares of Ideanomics using a formula contained in the Warrants.  The "Exercise Price" of the Warrants was $0.2867/share, subject to certain adjustments.  (SPA Ex. A §§ 1(b), 2.)

22.    The Warrants also contain a "Cashless Exercise" feature in the event that Ideanomics' stock traded below the Exercise Price.

23.    As stated in Section 1(d) of the form Warrant attached as Exhibit A to the SPA, the "Exchange Formula" applied to a Cashless Exercise is:

Net Number = (A x B) / C

For purposes of the foregoing formulas:

A= The total number of shares with respect to which this Warrant is then being exercised.

B= The Black Scholes Value (as defined in Section 16 herein).

C= The lower of the two Closing Bid Prices of the Common Stock in the two days prior the time of such exercise (as such Closing Bid Price is defined in Section 16 herein), but in any event not less than $0.01 (as may be adjusted for stock dividends, subdivisions, or combinations in the manner described in Section 2(a) herein).

24.    The numerator in the Exchange Formula is the total number of shares with respect to which the Warrant is exercised multiplied by the "Black Scholes Value," which is defined in Section 16 of the Warrant as:

(b)    "**Black Scholes Value**" means the Black Scholes value of an option for one share of Common Stock at the date of the applicable Cashless Exercise, as such Black Scholes value is determined, calculated using the Black Scholes Option Pricing Model obtained from the "OV" function on Bloomberg utilizing (i) an underlying price per share equal to the Exercise Price, (ii) a risk-free interest rate corresponding to the U.S. Treasury rate, (iii) a strike price equal to the Exercise Price in effect at the time of the applicable Cashless Exercise, (iv) an expected volatility equal to 135%, and (v) a deemed remaining term of the Warrant of five (5) years (regardless of the actual remaining term of the Warrant).

25.    The denominator in the Exchange Formula is lower of the closing prices of Ideanomics' common shares on the two days prior to Acuitas Capital's exercise to yield the total number of shares to be delivered to Acuitas Capital pursuant to the Warrant.

26.     As a result of the Exchange Formula, one Warrant could be exchanged for more than one share of Ideanomics stock.  Ideanomics clearly understood this fact, as Ideanomics specifically represented and warranted in Section 3(c) of the SPA that:

> As of the Closing, the Company shall have reserved from its duly authorized capital stock not less than the sum of (i) ***250%*** of the maximum number of Conversion Shares issuable upon conversion of the Purchase Shares (without taking into account any limitations on the conversion of the Purchase Shares set forth in the Amended and Restated Articles of Incorporation) and (ii) ***250%*** of the maximum number of Warrant Shares issuable upon exercise of the Warrants (without taking into account any limitations on the exercise of the Warrants set forth therein).

(Emphasis added.)  Such language would not have been necessary if each Warrant could only be converted for one share of common stock.

27.     Ideanomics also specifically represented and warranted in Section 1(c) of the Warrants that Ideanomics' obligation to deliver stock to Acuitas Capital upon exercise of the Warrants is "absolute and unconditional, irrespective of any action or inaction by [Acuitas]," including "any breach or alleged breach by [Acuitas Capital] or any other person of any obligation to [Ideanomics] or any violation or alleged violation of law by [Acuitas Capital] or any other person[.]"

28.     In Section 3(j) of the SPA, Ideanomics further acknowledged that its obligation to issue shares pursuant to the Warrants was "absolute and unconditional" notwithstanding "the dilutive effect" that such issuance might have on the other stockholders' ownership interests:

> The Company understands and acknowledges that the number of Conversion Shares and Warrant Shares may increase in certain circumstances. The Company further acknowledges that, except to the extent an issuance would exceed the beneficial ownership limitation in Section 1(e) of this Agreement, ***its obligation to issue the Conversion Shares upon conversion of the Purchase Shares and the Warrant Shares upon exercise of the Warrants in accordance therewith and with this Agreement is absolute and unconditional, regardless of the dilutive effect that such issuance***

> *may have on the ownership interests of other stockholders of the*
> *Company.*

(Emphasis added.)

29.     Ideanomics further agreed that, without the prior written consent of Acuitas Capital, Ideanomics would not, for a period of ninety (90) days beginning upon the later of November 14, 2022, or the effective date of the last registration statement filed for Ideanomics common stock, offer, sell, or otherwise transfer any shares of capital stock of Ideanomics or any securities convertible into or exercisable or exchangeable for shares of capital stock of Ideanomics, provided, however, that if Ideanomics' common stock was trading at least 20% higher than the conversion price of the Preferred Stock, Ideanomics shall have the right to utilize its Standby Equity Purchase Agreement ("SEPA"), agreed between Ideanomics and YA II PN ("YA") in August of 2022 to sell up to 3% of the outstanding volume of Ideanomics' common stock.  (SPA § 4(j).)

30.     The "last registration statement" was filed in December 2022 and declared effective on February 1, 2023.  Thus, the contractual lock-up period expires 90 days thereafter, or on May 2, 2023.

31.     The first Closing occurred on November 14, 2022, with Acuitas Capital purchasing 5 million shares of Preferred Stock and 5 million Warrants in exchange for $5 million. The second Closing occurred on December 21, 2022, with Acuitas Capital purchasing another 5 million shares of Preferred Stock and 5 million Warrants for another $5 million.  The third Closing occurred on February 7, 2023, with Acuitas Capital purchasing 10 million shares of Preferred Stock and 10 million Warrants for $10 million.

32.     Acuitas Capital twice converted Preferred Stock into Ideanomics common stock. First, on February 2, 2023, Acuitas Capital converted $5 million worth of the Preferred Stock

into 24,509,804 registered Ideanomics common shares.  Second, on February 15, 2023, Acuitas

Capital converted another $5 million of Preferred Stock into another 24,509,804 registered

Ideanomics common shares.  Ideanomics honored both conversions by delivering the requisite

number of registered common shares.

### Ideanomics Seeks to Renegotiate the Deal

33.     On February 8, 2023 – the day after the third Closing – Acuitas Capital principal

Michael Wachs ("Wachs") had lunch with Ideanomics' Chief Executive Officer Alf Poor ("Poor")

and Ideanomics' Senior Vice President Tony Sklar ("Sklar").  Poor and Sklar told Wachs that

Ideanomics would need more capital shortly and asked Acuitas Capital to provide an additional

investment or allow the company to utilize its SEPA with YA.  Wachs expressed surprise and

concern given that Acuitas Capital had just invested $20 million.

34.     Thereafter, Wachs and Poor exchanged several calls and emails attempting to

negotiate a deal by which Acuitas Capital's interest in Ideanomics would be bought out, which

Poor represented to Wachs was a condition precedent to a credit fund purchasing $75 million worth

of Ideanomics notes.  Poor told Wachs that Ideanomics needed funds "today" or the consequences

would be dire.

35.     On February 24, 2023, Wachs received a call from Greg Sichenzia ("Sichenzia"),

managing partner at Sichenzia, Ross, Ference, LLP – a law firm representing Ideanomics.

Sichenzia stated that Ideanomics was running out of money and requested that Acuitas Capital

allow Ideanomics to buy out Acuitas Capital's position so that Ideanomics could pursue other

financing.

36.     On February 28, 2023, Ideanomics' General Counsel Paula Whitten-Doolin

("Whitten-Doolin") sent a draft termination agreement for the SPA notwithstanding that the parties

had not reached any agreement on the terms of a buy-out.  The draft termination agreement valued

the Warrants improperly as it failed use the cashless exercise Exchange Formula even though Ideanomics' stock price was trading at $0.13 per share at the time, which was well under the $0.2867/share Exercise Price in the Warrants.

37.     In response, Wachs explained by email the Exchange Formula to Whitten-Doolin, quoting the relevant contractual provisions.  When Whitten-Doolin continued to disagree, Wachs pointed out that the Exchange Formula had been interpreted and specifically enforced in a case brought by Acuitas Capital's predecessor.  Whitten-Doolin responded, "I can pull their documents to review, but I'm not particularly nervous about this making it to court.  ***The greater risk to you is that the warrants, and all stock, are valueless***."  (Emphasis added.)

38.     After negotiations of a potential buy-out fell apart, Ideanomics refused to honor its contractual obligations to Acuitas.

### Ideanomics Breaches the Parties' Contracts

39.     On March 3, 2023, Acuitas Capital delivered a Conversion Notice to Ideanomics, seeking to convert $1 million worth of Preferred Stock into 4,901,960 registered common shares of Ideanomics.

40.     On March 6, 2023, Acuitas Capital delivered an Exercise Notice to Ideanomics, seeking to convert 5,555,555 Warrants into 7,974,481 registered common shares of Ideanomics (at a price per share of $.1254 for a $1 million value).

41.     On March 7, 2023, Whitten-Doolin, on behalf of Ideanomics, wrote to Peizer and Wachs of Acuitas Capital.  She claimed that the SPA was "null and void" because, on March 1, 2023, the United States Department of Justice unsealed an indictment against Peizer and the United States Securities Exchange Commission ("SEC") also sued Peizer and Acuitas Holdings for alleged insider trading having nothing to do with Ideanomics.  She concluded, "Therefore, at this time, Ideanomics cannot and will not honor any further conversion notices from Acuitas."

42.     Ideanomics' reasons for claiming that the SPA is "null and void" and refusing to honor Acuitas Capital's conversion notices are specious.

43.     First, Ideanomics understood full well that its counterparty was Acuitas Capital, *not* Acuitas Holdings.  The Buyer's Schedules attached as Exhibit B to the SPA identify Acuitas Capital as the Buyer.  In addition, the form Warrant attached to the SPA as Exhibit A specifically states on the first page that it is held by Acuitas Capital.

44.     In the Form 8-K filed by Ideanomics with the SEC on November 18, 2022, announcing Ideanomics' deal with Acuitas Capital, Ideanomics stated:

> On November 14, 2022, Ideanomics, Inc. (the "Company") entered into a Securities Purchase Agreement (the "SPA") **with Acuitas Capital, LLC** (the "Buyer"), pursuant to which the Buyer agreed to purchase (i) Series B Convertible Preferred Stock (the "Preferred Stock" together with any additional preferred stock from the Company, such number of shares having an aggregate purchase price equal to $20 million, if any, collectively, the "Purchase Shares") convertible into shares of Common Stock; and (ii) warrants (with any additional warrants, collectively, the "Warrants").

(Emphasis added.)

45.     Second, Ideanomics claimed that Acuitas Capital breached its representations and warranties in Section 2(h) of the SPA, which state in relevant part that "No part of the funds used by Buyer to acquire the Securities have been, or shall be, directly or indirectly derived from, or related to, any activity that may contravene federal, state, or international laws and regulations, including anti-money laundering laws and regulations" and "the amounts to be paid by Buyer to the Company will not be directly or indirectly derived from activities that may contravene federal, state or international laws and regulations, including anti-money laundering laws and regulations."

46.     Putting aside that Peizer denies the insider trading charges against him and will vigorously defend himself, the alleged insider trading involved Acuitas Holdings (not Acuitas Capital) and involved trading in a company called Ontrak, Inc. (not Ideanomics).  The

alleged insider trading also occurred during the period May 2021 through August 2021, well over a year before Acuitas Capital signed the SPA in November 2022 and transferred any funds to Ideanomics.  None of the funds resulting from that trading were invested in Ideanomics.

47.    Even if such funds had been invested in Ideanomics – which they were not – Ideanomics would at most have a claim against Acuitas Capital for any damages that Ideanomics actually suffers because of any breach of representation.  To date, there have been no such damages and any future damage is purely speculative.  In short, Ideanomics cannot unilaterally rescind the SPA as "null and void" – particularly having received $20 million from Acuitas Capital in exchange for the Convertible Securities and then honoring two conversions – in turn depriving Acuitas Capital of the full benefit of its bargain.

48.    Ideanomics' ploy of declaring the SPA "null and avoid" served two purposes.  First, if permitted, it would render Acuitas Capital's remaining Convertible Securities worthless. Second, it would enable Ideanomics to claim to YA or other potential financing sources that Ideanomics was freed from the SPA's "lock-up" provision.

49.    Ideanomics has not been allowed to utilize the SEPA because Ideanomics' stock has not traded at a price that is at least 20% greater than the conversion price of the Preferred Stock.  Nonetheless, upon information and belief, Ideanomics has sold or offered to sell Ideanomics capital stock to YA pursuant to the SEPA.  Over the last five business days alone, Ideanomics' trading volume has averaged a whopping 16.9 million shares per day – an 84% increase over its fourth quarter average volume of 9.1 million shares per day – which strongly suggests that Ideanomics has issued new stock to YA pursuant to the SEPA.

50.    Accordingly, Ideanomics has breached the SPA and must be ordered to comply with its contractual obligations.

**Acuitas Capital Will Be Irreparably Harmed If Ideanomics is Not Promptly Required to Comply With its Contractual Obligations**

51.     In both the SPA and Warrants, Ideanomics acknowledged that Acuitas Capital would be irreparably harmed if Ideanomics did not honor its contractual conversion obligations. Specifically, in Section 5(b) of the SPA, Ideanomics agreed:

> The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to Buyer.  Accordingly, the Company acknowledges that the remedy at law for a breach of its obligations under this Section 5(b) will be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Section 5(b), that Buyer shall be entitled, in addition to all other available remedies, to an order and/or injunction restraining any breach and requiring immediate issuance and transfer, without the necessity of showing economic loss and without any bond or other security being required.

52.     Section 14 of the Warrants contains substantively the same language.

53.     The threat of irreparable harm is greatly enhanced by Ideanomics' precarious financial situation.  As discussed above, Ideanomics executives and their outside counsel stated to Wachs in February 2023 that Ideanomics was running out of money and needed a cash infusion "today" or else the consequences would be dire.  Ideanomics' General Counsel then told Wachs in her email of February 28, 2023, that "[t]he greater risk to you is that the warrants, and all stock, are valueless."

54.     Ideanomics precarious finances are highlighted in its SEC filings.  For example, in its most recent Form 10-Q, for the period ending September 30, 2022, and filed with the SEC on November 9, 2022, Ideanomics reported:

- For the quarter ended September 30, 2022, Ideanomics lost $41.9 million from operations.  Its operating loss for the nine months ended September 30, 2022, was $122 million, versus $74.9 million for the nine months in the prior year.

- Net cash used in operations for nine months was $109.3 million, versus $42.6 million in the prior nine months of the year.

- This loss excludes the acquisition of Via Motors International Inc. ("VIA"), a development-stage electronic vehicle company that was completed in the fourth quarter of 2022, *after* the 10-Q was filed. This acquisition substantially increased the company's cash burn rate.

- Ideanomics had current cash of $25.2 million as of September 30, 2022, of which $15.1 million was restricted cash in China—*i.e.*, not considered to be part of the Company's liquid cash balances—and had accounts payable of $22.8 million.

- The company's monthly burn rate, based upon the nine months of cash utilized in operations through September 30, 2022, exceeds $10 million, for a company that had a few weeks' worth of cash as of that date.

- The company also reported accrued salaries of $7.9 million as of September 30, 2022.

55. Ideanomics further stated on pages 24-26 that it was running out of cash and there was no assurance additional financing could be obtained:

> **The Company believes that its current level of cash and cash equivalents are not sufficient to fund continuing operations or the addition of the two planned acquisitions in various stages of completion.** The Company will need to bring in new capital to support its growth and, as evidenced from its successful capital raising activities in 2020 and 2021, believes it has the ability to continue to do so. **However, there can be no assurance that this will occur.**
>
> . . .
>
> As of September 30, 2022, the Company's principal source of liquidity is its unrestricted cash balance in the amount of $25.2 million of which $15.1 million is held by the Company's subsidiaries located in China and is subject to foreign exchange control regulations and $2.2 million is the minimum regulatory capital required to be held by US operating companies – **we do not consider cash balances held in China or required minimum regulatory capital to be part of the Company's liquid cash balances. The Company has experienced greater net losses and negative cash flows from operating and investing activities in the third quarter consistent with its business plan for ongoing activities and planned acquisitions.** As of the date of the filing of this Form 10-Q, securing additional financing is in progress, and as such management has limited the extent to which it is taking actions to delay, scale back, or abandon future expenditures. **As such, management's actions to preserve an adequate level of liquidity for a period extending twelve months from the date of the filing of this Form 10-Q are no longer sufficient on their own without additional financing,**

> ***to mitigate the conditions raising substantial doubt about the Company's ability to continue as a going concern. We currently do not have adequate cash to meet our short or long-term needs.*** In the event additional capital is raised, it may have a dilutive effect on our existing stockholders.
>
> Although management continues to pursue these facilities and other opportunities to raise additional capital through a combination of debt financing, other non-dilutive financing and/or equity financing to supplement the Company's capitalization and liquidity, ***management cannot conclude as of the date of this filing that its plans are probable of being successfully implemented.***

(Emphasis added.)

56.     Exacerbating the cash crunch, Ideanomics completed the acquisition of VIA in the fourth quarter of 2022.  Ideanomics previously disclosed in its 10-Q on page 24 that VIA "will require operational and capital funding of at least $260.0 million in the next twelve months," which is on top of the massive $10-plus million per month that Ideanomics' existing businesses require.

57.     In addition, Ideanomics disclosed on page 85 of the 10-Q that it paid $5 million to settle a class action lawsuit against it last year and has had new complaints filed against it, increasing the risk of settlements or adverse rulings that could further deplete the company's capital.   The company also reported on page 86 of the 10-Q that it is subject to an SEC investigation.

58.     Ideanomics was just sued again on March 6, 2023, for in excess of $10 million for allegedly breaching a term sheet, dated November 8, 2022, for the purchase of senior securities convertible notes.

59.     With all of this bad news, Ideanomics' stock has hit an all-time low of less than $0.11/share, which is down more than 25% this year and has lost 87% of its value over the past 12 months.  Ideanomics has massive financial obligations in the coming months and no way to satisfy them other than through the issuance of stock that has lost most of its value even prior to the significant dilution occurring.  As a result, Acuitas Capital – which has already lost $2.5 million

on its investment in Ideanomics due to the decline of Ideanomics' stock price – is at substantial risk of losing the remaining $10 million.

60.     In sum, by its own admission, Ideanomics is in financial dire straits, and even if it raises more funds, the value of Acuitas Capital's interest in Ideanomics would be substantially diluted if not wiped out.

61.     If Ideanomics is not ordered promptly to comply with its contractual obligations and deliver to Acuitas Capital the registered and freely transferrable Ideanomics common stock called for by the March Notices and Acuitas Capital's future Conversion and Exercise Notices, Ideanomics' stock will likely be rendered, as its General Counsel stated, "valueless." Accordingly, Acuitas Capital has no adequate remedy at law.

## COUNT I
### (Breach of Contract)

62.     Acuitas Capital repeats and re-alleges the preceding paragraphs as if fully set forth herein.

63.     The SPA and related transaction documents, including the Convertible Securities, are valid and enforceable contracts.

64.     The SPA and related transaction documents provide that Acuitas Capital has a right to exchange the Convertible Securities for Ideanomics common stock by delivering a notice – a Conversion Notice, in the case of the Preferred Stock, and an Exercise Notice, in the case of the Warrants.

65.     On March 3, 2023, Acuitas Capital delivered a Conversion Notice to Ideanomics, seeking to convert $1 million worth of Preferred Stock into 4,901,960 registered common shares of Ideanomics.

66.     On March 6, 2023, Acuitas Capital delivered an Exercise Notice to Ideanomics, seeking to convert 5,555,555 Warrants into 7,974,481 registered common shares of Ideanomics (at a price per share of $0.1254 for a $1 million value).

67.     Acuitas Capital has fully performed its obligations under the SPA.

68.     Ideanomics has refused to honor the March Notices, falsely claiming that the SPA is "null and void."

69.     As a result of Ideanomics' breaches of the parties' contracts, Acuitas Capital is entitled to a decree of specific performance as well as preliminary and permanent injunctive relief requiring Ideanomics to comply with the terms of the SPA, deliver to Acuitas Capital the registered Ideanomics common stock called for in the March Notices, and any future Conversion or Exercise Notices, and comply with the contractual lock-up period.

70.     As discussed above, the SPA and Warrants specifically state that Acuitas Capital will be irreparably harmed by a breach of the parties' contracts and, in fact, Acuitas Capital has no adequate remedy at law.

71.     In the alternative, and only in the alternative, should the Court find that specific performance and injunctive relief are not warranted notwithstanding Ideanomics' acknowledgement of irreparable harm in the parties' contracts and Ideanomics' admittedly dire financial condition, then Acuitas Capital is entitled to monetary damages.

## COUNT II
### (Declaratory Judgment)

72.     Acuitas Capital repeats and re-alleges the preceding paragraphs as if fully set forth herein.

73.     The SPA provides that Acuitas Capital has a right to exchange the Convertible Securities for registered and freely transferable Ideanomics common stock by

delivering a Conversion or Exercise Notice (as the case may be) to Ideanomics, which in turn requires Ideanomics to deliver to Acuitas Capital the number of Ideanomics shares of common stock called for by the Notice.

74.     On March 7, 2023, Ideanomics denied that it has an obligation to comply with Acuitas Capital's Conversion and Exercise Notices, asserted that the SPA was "null and void," and repudiated its obligation to comply with the pending and any future Conversion or Exercise Notices.

75.     Accordingly, an actual and justiciable controversy has arisen and now exists between the parties as to whether Ideanomics is required to honor Acuitas Capital's pending and future Conversion and Exercise Notices as well as Ideanomics' lock-up obligations.

76.     Declaratory relief would clarify and stabilize the disputed relationship between the parties as to their respective rights and obligations.

77.     Accordingly, Acuitas Capital requests a declaratory judgment declaring or determining that the SPA and related transaction documents are valid and binding contracts that remain in effect and that Ideanomics is required to honor Acuitas Capital's March Notices and future Conversion and Exercise Notices as well as its lock-up obligations.

78.     As explained above, Acuitas Capital has no adequate remedy at law.

## COUNT III
### (Indemnification)

79.     Acuitas Capital repeats and re-alleges the preceding paragraphs as if fully set forth herein.

80.     The SPA states that Ideanomics is required to indemnify Acuitas Capital for any losses (including Acuitas Capital's reasonable attorney's fees and disbursements) that Acuitas Capital suffers as a result of Ideanomics' breach of the SPA.

81.     Specifically, in Section 10(k) of the SPA, Ideanomics agreed as follows:

In consideration of Buyer's execution and delivery of the Transaction Documents and acquiring the Securities thereunder and in addition to all of the Company's other obligations under the Transaction Documents, ***the Company shall*** defend, protect, ***indemnify and hold harmless Buyer*** and each holder of any Securities and all of their stockholders, partners, members, officers, directors, employees and direct or indirect Buyers and any of the foregoing Persons' agents or other representatives (including, without limitation, those retained in connection with the transactions contemplated by this Agreement) (collectively, the "Indemnitees") from and against any and all actions, causes of action, suits, claims, ***losses, costs, penalties, fees, liabilities and damages, and reasonable and documented expenses in connection therewith*** (irrespective of whether any such Indemnitee is a party to the action for which indemnification hereunder is sought***), and including reasonable attorneys' fees and disbursements*** (the "Indemnified Liabilities"), ***incurred by any Indemnitee as a result of, or arising out of, or relating to*** (a) any misrepresentation or breach of any representation or warranty made by the Company in any of the Transaction Documents, (b) ***any breach of any covenant, agreement or obligation of the Company contained in any of the Transaction Documents*** . . . .

(Emphasis added.)

82.     Accordingly, should Acuitas Capital prevail in this lawsuit, it is entitled to reimbursement by Ideanomics of Acuitas Capital's reasonable attorney's fees and disbursements and any other losses that Acuitas Capital suffers.

## PRAYER FOR RELIEF

83.     **WHEREFORE**, Plaintiff prays for relief and judgment as follows:

(a)     On Count I, a decree of specific performance and a preliminary and permanent injunction requiring Ideanomics (i) to honor Acuitas Capital's Conversion Notice, dated March 3, 2023, which seeks to convert $1 million worth of Preferred Stock into 4,901,960 registered common shares of Ideanomics and Acuitas Capital's Exercise Notice dated March 6, 2023, seeking to convert 5,555,555 Warrants into 7,974,481 registered common shares of Ideanomics and (ii) enjoining Ideanomics from offering, selling, or otherwise transferring any shares of capital stock of Ideanomics or any securities convertible into or exercisable or

exchangeable for shares of capital stock of Ideanomics, provided, however, that if Ideanomics' common stock was trading at least 20% higher than the conversion price of the Preferred Stock, Ideanomics shall have the right to utilize its SEPA to sell up to 3% of the outstanding volume of Ideanomics' common stock;

      (b)    On Count II, a declaratory judgment declaring or determining that the SPA and related transaction documents (including the Convertible Securities) are valid and binding legal obligations that Ideanomics is required to honor, including the March Notices, all future Conversion and Exercise Notices sent pursuant to the terms of the SPA, and the SPA's restrictions on offering, selling, or otherwise transferring Ideanomics securities;

      (c)    In the event that such injunctive and declaratory relief is not ordered, awarding damages in an amount to be determined at trial as well as pre- and post-judgment interest;

      (d)    Awarding Plaintiff its reasonable attorney's fees and costs; and

      (e)    Granting such and other further relief as the Court may deem just and proper.

Dated: New York, New York
      March 13, 2023

McDERMOTT WILL & EMERY LLP

/s/  *Andrew B. Kratenstein*
Andrew B. Kratenstein
Lisa A. Gerson
One Vanderbilt Avenue
New York, New York 10017
(212) 547-5400

*Attorneys for Plaintiff Acuitas Capital, LLC*