UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ACUITAS CAPITAL, LLC,<br><br>　　　　　　　　plaintiff,<br><br>　v.<br><br>IDEANOMICS, INC.,<br><br>　　　　　　　　Defendant. | 23-CV-02124 (PAE)<br><br>DECLARATION OF<br>PAULA WHITTEN-DOOLIN IN<br>OPPOSITION TO MOTION FOR<br>INJUNCTIVE RELIEF |

I, Paula Whitten-Doolin, do hereby declare the truth of the foregoing under penalty of perjury pursuant to 28 U.S.C. §1746 as follows:

1.  I am the General Counsel of defendant Ideanomics, Inc. ("Ideanomics"). I submit this declaration in furtherance of Ideanomics' opposition to plaintiff's motion for injunctive relief. I am familiar with the facts and circumstances set forth herein based upon my own knowledge of Ideanomics' business records, my involvement in the underlying transaction and the company's filings with the United States Securities and Exchange Commission ("SEC").

2.  Ideanomics is an American multinational company, headquartered in New York, whose goal is to accelerate the commercial adoption of electric vehicles. Ideanomics conducts its operations globally in one segment with three business units – Ideanomics Mobility, Ideanomics Energy, and Ideanomics Capital. Ideanomics Mobility's focus is electric vehicles, including mid- and last-mile delivery trucks and vans, tractors, and two-wheelers. Ideanomics Energy's focus is charging and energy-related products and services. Ideanomics Capital's focus is providing financing support for the Company's Mobility and Energy business units.

3.  The diverse businesses of Ideanomics include:

    a.  VIA Motors: U.S. based all-electric commercial vehicle manufacturer with operations in Utah and Michigan. VIA's value is rooted in its VDRIVE™ electric skateboard and VTRUX® modular vehicle portfolio, which has been designed from

      the ground up to meet the needs of commercial fleet operators and drivers. VIA will offer a full range of fit-for-purpose configurations with its chassis cab including last-mile delivery vans, box and stake trucks, school buses and shuttles, and more.

   b. WAVE – Ideanomics Energy recently began consolidating its EV charging operations under a single brand, WAVE Charging, capitalizing on the brand recognition of the WAVE wireless charging product. WAVE Charging products include: a high-power inductive (wireless) charging solution for medium and heavy-duty EVs, which powers America's first all-electric bus fleet in California, the electric Tram System at Universal Studios Hollywood; PEA Containerized Charging, which isa new way to think about charging for commercial fleets offered in containerized form (fast, easy, affordable and scalable); and ChargeBIG: The chargeBIG 18-36 AC system's centralized control unit is easy to install, and provides dynamic load management for up to 36 individual charging points with a charging power of either 7 kW, 11 kW or 19 kW.

   c. US Hybrid - US Hybrid is a California-based zero-emission engineering and vehicle integration business that manufactures electric and hybrid electric propulsion kits, and also performs retrofits to convert diesel powered specialty vehicles such as port equipment and buses to reduced emissions.

   d. Solectrac - Solectrac is a California-based assembler and distributor of electric powered tractors and is a certified B Corp. As a first mover, Solectrac has built a leadership position in the North American electric tractor market and is ahead of direct competitors who are just now beginning to develop or introduce their own EV solutions.

   e. Energica - Energica is an Italian company recognized for producing the world's best high performance electric motorcycles. Energica is building its reputation as a leading electric motorcycle provider to police fleets, and its motorcycles are being piloted by several police departments around the world. Energica captured the attention of global police fleets in 2022 when it provided 88 electric motorcycles to the Indonesian Police Department for use during the G20 Summit.

4.    Ideanomics is a public company with its headquarters in New York, New York. It maintains certain offices in China and is in the process of expanding its facilities in Italy; it also has operations in Spain, the United Kingdom, and Malaysia. Plaintiff's arguments that the bulk of Ideanomics' business is generated from China are false.

5.    Ideanomics stock is traded on the NASDAQ Exchange under the symbol IDEX. There are over 200,000 shareholders of the stock. From November 4, 2022, through March 22, 2023, the

daily volume of the shares traded in the stock ranged from a low on November 4, 2022 of 5,281,400 shares per day to a high of approximately 39,000,000 shares per day. Annexed hereto as Exhibit 1 is a true copy of the Ideanomics, Inc. Stock Historical Prices and Data from Yahoo Finance.

**The SPA**

6. Ideanomics is a growth company and thus will utilize investor money to better its business lines. It is not uncommon for the company to run a deficit in terms of profit and losses. In or about late October or early November 2022, Mr. Wachs and Mr. Peizer initiated contact with the company for the purpose of determining if the company would be interested in an investment by Plaintiff in return for equity in the company. Plaintiff's business was to purchase securities from issuers such as Ideanomics and thereafter utilizing the discount to market value it received in return and immediately sell the common stock in the open market for Plaintiff's own account.

7. The agreement, as proposed by plaintiff, was a securities transaction whereby plaintiff would provide Ideanomics twenty-million dollars in exchange for an equity investment in the company. In exchange for the investment plaintiff received convertible securities in the form of preferred stock and warrants. The conversion structure for the preferred to common and the warrants to common stock was delineated in the SPA. *See* Decl. of Terren Peizer ("TP Dec."), Exh. 1 ("SPA") ¶1, 3-4.

8. The draft SPA and much of the negotiations were effectuated via email and telephone. An SPA was executed by the parties on November 14, 2022, with few changes to the form document supplied by plaintiff. The funds were sent by plaintiff to Ideanomics via wire.

**Conversions Effectuated by plaintiff**

9. In accordance with the terms of the SPA, on February 2, 2023, plaintiff sent a notice of conversion to have $5 million worth of Ideanomics preferred stock converted into 24,509,804

shares of Ideanomics' common stock. At the direction of Ariel Davis of Acuitas Group Holdings, LLC, the shares were to be, and were, delivered electronically to plaintiff's agent, Gel Direct LLC. See TP Dec. Exh. C [8-3]. The shares were converted at a discount to market for the benefit of plaintiff.

10. The stock opened that day at $0.21 and closed at $0.19. See Exh. 1.

11. On the day of conversion the trading volume of Ideanomics almost equaled the amount of shares plaintiff converted. See Exh. 1. Upon information and belief, upon receipt of the shares plaintiff immediately sold them into the open market.

12. On February 15, 2023, plaintiff sent a notice of conversion to convert an additional $5 million worth of Ideanomics preferred stock into 24,509,804 shares of Ideanomics' common stock. At the direction of Ariel Davis of Acuitas Group Holdings, LLC, the shares were to be, and were, delivered electronically to plaintiff's agent, Gel Direct LLC. See TP Dec. Exh. D [8-4]. The stock opened and closed that day at $0.16. See Exh. 1. The shares were converted, at a discount, for the benefit of plaintiff.

13. On the day of the conversion the trading volume of Ideanomics almost equaled the amount of shares plaintiff converted. See Exh. 1. Upon information and belief, upon receipt of the shares plaintiff immediately sold them into the open market.

**The Two Conversions That Were Not Honored**

14. On March 3, 2023, plaintiff sent another notice of conversion for $1 million of Series B Preferred into 4,901,960 shares of Ideanomics common stock. See TP Dec. Exh. E [8-5]. This conversion was not honored by Ideanomics.

15. The stock on that day opened and closed at $0.13. See Exh. 1. If all shares of the proposed conversion were received and sold into the open market on the day of the conversion, as appears

to be the normal course of conduct for plaintiff, multiplying the number of shares by the price of the stock, the shares would have been sold for $637,254.80.

16.     On March 6, 2023, plaintiff sent another notice of conversion seeking to convert 5,555,555 warrants into 7,974,481 shares of Ideanomics common stock.  See TP Dec. Exh. F [8-6].  This was not honored.

17.     The stock on that day opened at $0.13 and closed at $0.12.  See Exh. 1.  If all shares of the proposed conversion were received and sold into the open market on the day of the conversion, multiplying the number of shares by the price of the stock (using the higher figure for purposes of this calculation), the shares would have been sold for $1,036,682.53.

**Ideanomics Learns of An Indictment, A SEC Complaint and A Felon**

18.     On March 2, 2023 (e.g. the day before the March 3rd conversion notice was received), we learned troubling news relating to Terren Peizer, Acuitas Group Holdings, LLC ("Holdings") and plaintiff's principal, and Michael Wachs, an individual working for plaintiff.

19.     As to Mr. Peizer, we learned of the indictment ("Indictment") against him alleging criminal violations of securities laws, specifically insider trading with respect to shares of Ontrak, Inc.  TP Dec. Exh. I [08-9]

20.     At the same time, we learned that the SEC filed a complaint against Mr. Peizer and Acuitas Group Holdings, LLC alleging civil violations of securities laws. Id. Exh. J [08-10]

21.     While plaintiff alleges the indictment was simply a predicate for Ideanomics trying to get out from under the terms of the SPA, that is not true.

22.     Learning of the indictment and SEC complaint immediately caused additional due diligence as to plaintiff, its principal Mr. Peizer, the relationship between the two and Acuitas Group Holdings, LLC, as well as Mr. Wachs.

23. As to Mr. Wachs, we learned he is a convicted felon, having stolen more than $20,000,000 from Chase Manhattan Bank. This conviction resulted in Mr. Wachs receiving a lifetime ban from the National Association of Securities Dealers ("NASD") (n/k/a the Financial Industry Regulatory Authority "FINRA") as well as a lifetime ban from the Federal Reserve Board ("FRB"). Annexed hereto as Exhibit 2 is a true copy of the FINRA Disciplinary Report (p.438) identifying Mr. Wach's FINRA bar. Annexed hereto as Exhibit 3 is a true copy of the FRB's barring order.

24. We then began looking at the relationship between Acuitas Group Holdings, LLC and plaintiff. Mr. Peizer is the chairman of both entities.

25. First I looked to the underlying SPA. The parties to the SPA are deemed (in the precatory paragraph of the investment vehicle) to be the signatories to the document. A review of the signature pages of the SPA (pages 29 and 30 of the filing) shows one party is Ideanomics. However, the Buyer is not identified by an entity, but signed by Mr. Peizer with no title or affiliate designation. See TP Dec. Exh. A [8-1]. A closer review identifies the affiliated email address is not plaintiff, but rather Acuitas Group Holdings, LLC.

26. I then looked to the first two conversion notices and realized they were not sent by plaintiff, but rather an employee of Acuitas Group Holdings, LLC: Ariel Davis.

27. Section 2(h) of the SPA is a representation by plaintiff that "(1) No part of the funds used by Buyer to acquire the Securities have been, or shall be, directly or indirectly derived from, or related to, any activity that may contravene federal, state, or international laws and regulations, including anti-money laundering laws and regulations". SPA 2(h).

28. This requirement ensured that funds provided by plaintiff, which would result in a significant return on investment via the warrants, would not put Ideanomics at risk for being involved, even if tangentially, in the furtherance of a criminal scheme (or civil violations of

securities laws). Ideanomics relied upon this language to ensure that neither the counterparty, nor any affiliate of the counterparty, was providing money to Ideanomics which would be subject to forfeiture under multiple statutes commonly referred to as anti-money laundering regulations.

29. Ideanomics cannot be in the position of assisting a criminal or civil scheme whereby potential ill-begotten gains of insider trading are utilized by Acuitas Group Holdings, LLC to fund the investment by plaintiff in Ideanomics. Moreover, Ideanomics cannot be a conduit to allow plaintiff and Acuitas Group Holdings, LLC to gain further returns on potentially illegally obtained funds through the use of the conversion process of Ideanomics' stock.

30. Mr. Peizer argues in his submission the alleged actions giving rise to his indictments took place a year prior to the November 2022, transaction with Ideanomics, and thus could not be the same funds, particularly when the allegations relate not to plaintiff, but to Acuitas Group Holdings, LLC. See TP Dec. ¶34 [Dkt. 8]

31. Mr. Peizer fails to understand that if funds from Acuitas Group Holdings, LLC to plaintiff were secured in violation of securities laws, civil or criminal, then such fungible monies could have been used thereafter for the SPA investment.

32. Plaintiff also argues Acuitas Group Holdings, LLC is a separate entity than plaintiff, thereby precluding any viable argument the alleged ill-begotten funds deposited in Acuitas Group Holdings, LLC made their way to plaintiff. However, in the next breath, plaintiff admits that the sole member of Acuitas Capital, LLC is Acuitas Group Holdings, LLC.

33. Securities filings by plaintiff and Acuitas Group Holdings further illustrate the lack of distinction between the two entities. We refer the Court to the November 7, 2022, Schedule 13G joint filing by Acuitas Group Holdings, LLC, plaintiff, and Mr. Peizer for Creatd, Inc. In that filing there is an explanation of the relationship between the three: "Acuitas Capital is an entity wholly

owned by Acuitas [Group Holdings, LLC]. Acuitas is a private investment vehicle beneficially owned and controlled by Mr. Peizer. Mr. Peizer is the sole member and Chairman and managing member of Acuitas and, in such capacity, exercises the sole voting and investment power over the Shares of the Company held for the accounts of Acuitas and Acuitas Capital." Annexed hereto as Exhibit 4 is a true copy of the Creadt, Inc. Schedule 13G filing.

34. While Mr. Peizer in his moving papers seeks to differentiate the two entities, it is clear both work at the mercy of Mr. Peizer, and they follow the proverbial "what's mine is yours" intermingling of assets theory. Indeed, that is what is in another Schedule 13 G: "As of the date hereof, Acuitas may be deemed to have beneficial ownership of 3,000,000 Shares, representing 3,000,000 Shares held directly by Acuitas Capital, an entity wholly owned by Acuitas." Id. This act of having one company control the assets of another appears to be a common course of conduct by Mr. Peizer. Annexed hereto as Exhibit 5 is a true copy of the Schedule 13G filing of plaintiff, Holdings and Mr. Peizer for another entity, FingerMotion, Inc.

35. Ideanomics seeks only to protect itself and its shareholders. To that end, while it does not believe injunctive relief should be issued, Ideanomics would not oppose a directive from this Court depositing the shares sought in the two conversion notices that were not honored with the Court. Let the Department of Justice, the SEC, the plaintiff, its alter ego, Acuitas Group Holdings, LLC and Mr. Peizer resolve the issue as to whether the funds that were received by Ideanomics emanated from ill-begotten gains of Mr. Peizer and Acuitas Group Holdings, LLC.

**Plaintiff's Allegations of Insolvency Are Baseless**

36. Plaintiff argues the injunction should be issued because Ideanomics is soon to be insolvent. Such a position is baseless.

37.     In the first instance, plaintiff relies primarily upon the Ideanomics Form 10Q filed with the SEC on November 8, 2022.  This is a publicly accessible document that was filed prior to plaintiff entering the SPA.

38.     As part of its representations plaintiff identifies itself as an experienced buyer in this business "so as to be capable of evaluating the merits and risks of the prospective investment in the Securities, and has so evaluated the merits and risks of such investment." See TP Dec., Exh. A, ¶2f.

39.     Presumably the SEC filings, including the Form 10Q, were of such importance to plaintiff that it required a representation by Ideanomics that it was up to date on all of its required SEC filings. Id., ¶3i.

40.     Thus, in valuing the merits of its investment in Ideanomics, it is presumed plaintiff reviewed not just the September 2022 10Q, but also the company's Form 10Qs from the same time frame for years past so plaintiff could understand Ideanomics' finances.  Annexed hereto as Exhibits 6, 7 and 8 are true copies of Ideanomics Form 10Qs filed in 2021, 2020 and 2019.   The general financial status of the company has not changed during this time frame.

41.     On September 14, 2022, Ideanomics entered into a Standby Equity Purchase Agreement (the "SEPA") with YA II PN, Ltd., ("YA").  Under this agreement Ideanomics has the right to request cash proceeds in return for shares of the company.

42.     Ideanomics' business is moving forward.  This month alone Ideanomics has received infusions of cash totaling approximately $5.5 million to assist with its ventures.

43.     Ideanomics is a growth company, seeking investment funds to further its business ventures, benefiting itself and its shareholders.  Demonstrating some of the ongoing business ventures, the company has issued press releases, all of which are publicly available.  Annexed hereto as Exhibit 9 are true copies of the March 16, 15, 14, 9, 8 and February 9, 2023 press releases of Ideanomics.

44. In addition to the infusion of cash set forth above, Ideanomics is restructuring and closing down certain Chinese subsidiary companies. In May 2023, as a result of this reduction in subsidiaries, Ideanomics will repatriate to the United States approximately $7 million dollars previously required to be reserved in China.

45. This infusion of funds will be put to use for the benefit of the company, and thus axiomatically, the benefit of the company's shareholders. The conclusory claims of an imminent collapse of the company are baseless.

**Plaintiff's Argument Of Dilution Is Baseless**

46. Plaintiff argues if the injunctive relief is not granted, more stock may be issued to other lenders diluting the share value. Plaintiff is wrong.

47. First, plaintiff seeks to utilize the volume and price of the stock from a lookback of one year when the appropriate lookback for the average volume should be the time during which the SPA was signed, or November 2022. From November 2022 through present, the value of the shares seemed to plummet (not coincidentally) at the same time plaintiff received the two tranches of shares and presumably did block trades resulting in the sinking of the stock price. Notably, when the conversions were not honored, the stock stabilized. See Exh. 1

**Improper Use Of Settlement Discussions/Communications**

48. In February 2023, Ideanomics sought to work out a settlement of the SPA. A review of the emails attached to Mr. Wachs' declaration confirms the parties were working on settlement. To that end there were numerous telephone calls and emails relating to the settlement, including a draft termination agreement I circulated.

49. Plaintiff inappropriately utilizes these settlement negotiations and the dispute relating to the same, as evidence in support of the application.

50. Plaintiff relies upon my email statement, again utilized in the course of trying to negotiate a buy-out of the SPA, where I wrote "the greater risk to you is that the warrants, and all stock, are valueless." While it is true that I could have chosen better words in the course of trying to negotiate a buy-out position for the company, nothing in the statement indicated there was going to be a free-fall in the stock price or that the company was going out of business if the proposed settlement was not entered into by the parties. This was nothing but posturing on my part to secure the settlement terms.

51. The inference made by plaintiff that Ideanomics would want the company to falter is, at best, nonsense. First, if that were to happen not only would I lose my job, but so too would six hundred and seventy others. In addition, part of my compensation package, and that of other executives, is payment in Ideanomics' stock. Thus, it would be wholly counter-intuitive for either myself or any other principal of the company to force down share values just to spite plaintiff.

For the reasons set forth herein, Ideanomics respectfully requests the Court deny the application for injunctive relief.

Dated:   March 24, 2023
         Houston, Texas

By: _____
    Paula Whitten-Doolin