N3VZZACUCNK

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ACUITAS CAPITAL, LLC,

 4                   Plaintiff,

 5            v.                              23-CV-2124 (PAE)

 6   IDEANOMICS,
                                             Conference
 7
                     Defendant.
 8
     ------------------------------x
 9                                           New York, N.Y.
                                             March 31, 2023
10                                           3:00 p.m.

11   Before:

12                   HON. PAUL A. ENGELMAYER,

13                                           District Judge

14                           APPEARANCES

15   MCDERMOTT WILL & EMERY, LLP
          Attorneys for Plaintiff
16   BY:  ANDREW KRATENSTEIN
          LISA GERSON
17
     LAW OFFICES OF BARRY BORDETSKY
18        Attorney for Defendant
     BY:  BARRY BORDETSKY
19
     ALSO PRESENT:   HILARY UDOW
20                   GABRIELLE LIPSITZ
                     MICHAEL WACHS
21

22

23

24

25
```

N3VZZACUCNK

```
 1              (Case called)
 2              MR. KRATENSTEIN:  Good afternoon, your Honor.
 3              Andrew Kratenstein of McDermott Will & Emery.  With me
 4    is Lisa Gerson, also from McDermott Will & Emery, for the
 5    plaintiff, Acuitas Capital.
 6              THE COURT:  Very good.  Good afternoon to you.
 7              MR. BORDETSKY:  Good afternoon, your Honor.
 8              Barry Bordetsky, from the Law Office of Barry
 9    Bordetsky, for the defendant, Ideanomics.
10              THE COURT:  All right.  Very good.  Good afternoon to
11    you as well.
12              And good afternoon to the others in the audience.
13              May I ask who they are?
14              MR. KRATENSTEIN:  Yes.  With me are two associates
15    from our firm, Hilary Udow and Gabrielle Lipsitz; and Michael
16    Wachs, who submitted a declaration.  He's a consultant to
17    Acuitas Capital.
18              THE COURT:  Very good.  Welcome.  I'm glad you're
19    here.  Thank you.
20              You may all be seated.
21              First all, let me thank counsel.  I'm mindful that
22    this has crept up on everybody all of a sudden, and I am
23    grateful to all of you for the excellent legal work all around.
24    Specifically, I'm looking at the younger people on your team.
25    So thank you, everybody, for all the work that's gone into
```

N3VZZACUCNK

1    litigating both sides of the controversy.

2         I think I've got a pretty good sense of things and I

3    think this hearing is best organized by my putting questions to

4    each side, rather than having a freestanding argument.

5         So let me begin with you, Mr. Kratenstein.

6         MR. KRATENSTEIN:  Kratenstein.

7         THE COURT:  Kratenstein.

8         MR. KRATENSTEIN:  Thank you.

9         THE COURT:  The only arguments that you have been

10   presented, as I understand from Ideanomics as to why the

11   conversion is not something that you're entitled to as a matter

12   of contract are twofold: one is the insider trading indictment;

13   and the other is the notion that Acuitas is an unregistered

14   dealer.

15        Those are the two arguments that had been offered,

16   correct?

17        MR. KRATENSTEIN:  Correct.

18        THE COURT:  Nothing else?

19        MR. KRATENSTEIN:  Correct.

20        THE COURT:  Give me a minute or two or a minute just

21   on the insider trading indictment.  This is your CEO, your

22   client's CEO?

23        MR. KRATENSTEIN:  Correct.

24        THE COURT:  And does it have anything to do with

25   Ideanomics?

N3VZZACUCNK

1           MR. KRATENSTEIN:  No.

2           THE COURT:  What is he alleged to have insider traded

3     in?

4           MR. KRATENSTEIN:  He is alleged to have insider traded

5     in a stock called Ontrak where he was, I believe, on the board

6     of that company and violated the policies about when he could

7     dispose, allegedly, of that stock.

8           THE COURT:  I see.  And what's the status of that

9     allegation?

10          MR. KRATENSTEIN:  The indictment was just unsealed.  I

11    don't even know if he's been arraigned yet, but I do know that

12    he intends to plead not guilty and fight the charges.

13          THE COURT:  What court is that in?

14          MR. KRATENSTEIN:  California, Central District, I

15    believe.

16          THE COURT:  Okay.  And I take it that Acuitas is not

17    implicated there.  In other words, for better or worse, it's

18    the CEO in a separate capacity in his officer or trustee or

19    director responsibility role with respect to that other

20    concern?

21          MR. KRATENSTEIN:  Correct.

22          THE COURT:  Is there any allegation that Acuitas's

23    money is in some way implicated in the insider trading

24    allegation?

25          MR. KRATENSTEIN:  By Acuitas, do you mean Ideanomics?

N3VZZACUCNK

1          THE COURT:  Well, I mean really either.

2          MR. KRATENSTEIN:  The allegations --

3          THE COURT:  I mean it's Acuitas's CEO, right, who is

4     the insider trader-defendant?

5          MR. KRATENSTEIN:  Correct.  So there's a different

6     entity called Acuitas Group Holdings, which is the parent

7     company of Acuitas Capital, the plaintiff in this case.

8          THE COURT:  Right.

9          MR. KRATENSTEIN:  There was no allegation and Acuitas

10    Capital is not a party to either the DOJ or SEC actions in

11    California.

12         THE COURT:  All right.  Now, let's just assume, just

13    indulging pure hypothetical, that the indictment had named the

14    Acuitas entity that's the party here.  Same result?

15         MR. KRATENSTEIN:  Same result in the case?

16         THE COURT:  No.  In other words, let's just assume

17    that it was actually -- the indicted entity actually was a

18    party to this case, that Acuitas Capital was a charged but only

19    indicted defendant in that case.  Would that have made any

20    difference?

21         MR. KRATENSTEIN:  No.  I don't think it makes any

22    difference here whatsoever.

23         THE COURT:  Is there anything in the SPA that

24    precludes somebody who has a pending criminal charge from

25    conversion rights?

N3VZZACUCNK

1        MR. KRATENSTEIN:  No.  In fact, quite the opposite.

2   There is something in the SPA that says any unlawful conduct by

3   anybody does not excuse the defendant from performing their

4   obligations.

5        THE COURT:  Okay.  What about the second argument,

6   which is the unregistered dealer?  Supposing they were an

7   unregistered dealer, whatever that is, would that bar them from

8   conversion rights?

9        MR. KRATENSTEIN:  No.  As your Honor, I'm sure, knows

10  from having reviewed the case law, there are at least a half

11  dozen cases where courts in this district have held quite the

12  contrary because the contract does not, on its face, require a

13  conversion or sale of stock.  Thus, it is not -- even if you

14  assumed that the plaintiff in those cases was a dealer, that

15  would still not be a violation of Section 29(b).

16        THE COURT:  Is Acuitas, LLC a dealer?

17        MR. KRATENSTEIN:  No.  We contend that Acuitas

18  Capital, LLC is not a dealer for several reasons.  They are an

19  investor, but they're not a dealer.

20        First of all, if that were true, then every plaintiff

21  in the cases that I was just talking about presumably would be

22  a dealer.  But, yes, they invest in companies.  They also take

23  risks.  When you think of a dealer, and what the cases talk

24  about, and obviously there are several factors, but the cases

25  talk about things like the dealer and the entity is really not

N3VZZACUCNK

1    taking any risks.  It's just making money on other people's

2    transactions.

3            THE COURT:  Like a market maker?

4            MR. KRATENSTEIN:  Yes.  That's not what's happening

5    here.  This is an investment that was made by a company and

6    they hope -- yes, of course, they hope to make a return on that

7    investment.  Does not make them a dealer.  But, of course, even

8    if they were, that would be sufficient.

9            THE COURT:  The context in which these allegations

10   were made appears to bespeak some desperation on Ideanomics's

11   part.  And I need your help a little bit in understanding it.

12   Why is it that Ideanomics, from your perspective, simply

13   doesn't want to convert to Acuitas?  Let me put it this way:

14   Ideanomics has already gotten the $20 million or whatever from

15   Acuitas.  Acuitas wants to exercise the right that it bought in

16   exchange, in effect, for giving the $20 million.  What skin off

17   of Ideanomics's nose is it?  Why is it that, given the economic

18   shape it's in, somehow or other converting matters?

19           MR. KRATENSTEIN:  The best I can do to answer your

20   question, the question, your Honor, is to convey what I

21   understand was conveyed actually to Mr. Wachs, who is sitting

22   here, what we put in our papers, which is that it would -- if

23   the company honored its obligations to Acuitas Capital, that

24   would make it more difficult for Ideanomics to get the

25   financing it so badly needs because it's issuing stock, and

N3VZZACUCNK

1    that stock could be sold at the depressed stock price.  I

2    assume that that's what they're getting at, but I don't know

3    for sure.

4            THE COURT:  But I was trying to figure it out.  In

5    other words, I thought, you know, one scenario would be that

6    there's some legal or other cap on the number of shares that

7    could be issued, and, in effect, if Ideanomics vacuums up a

8    large number of them, and it would be a very large number given

9    how watered down the stock price is, maybe there would be less

10   to be issued to a future investor.

11           MR. KRATENSTEIN:  That's exactly right.  I think you

12   meant Acuitas Capital.  Yes.

13           THE COURT:  Sorry.

14           MR. KRATENSTEIN:  But if Acuitas Capital got all the

15   stock -- and we also noted this in our papers -- if you're

16   going to raise capital, obviously a form of compensation for

17   that is stock.  There's only so much registered stock.  So

18   there's a new risk that's actually disclosed in the 10-K that

19   they may have to go and get more stock registered if they want

20   to raise more money from others.  And so, yes, that is, I

21   presume, one of the reasons also that they don't want to issue

22   their --

23           THE COURT:  But that one leapt off the page as a

24   plausible reason why they would be reluctant to issue what

25   would be many, many shares to Acuitas --

N3VZZACUCNK

1          MR. KRATENSTEIN:  Yes.

2          THE COURT:  -- but I'm not sure I understand your

3     first point as to why this would matter.  In other words, if I

4     am a separate investor, putting aside any cap, I still know

5     that Acuitas has this right to convert.  As long as that hasn't

6     been disclosed to the other investor, why is it that Acuitas's

7     right, whether exercised or latent, is likely to deter another

8     investor from investing?

9          MR. KRATENSTEIN:  Yes.  And I think there's also the

10    Standby Equity Purchase Agreement that's important, which they

11    already had in place.  But remember, the Standby Equity

12    Purchase Agreement, under the deal with Acuitas Capital, there

13    was the lock-up.  So they needed the cash.  They couldn't

14    utilize -- if you still follow our agreement, they couldn't

15    utilize that cash for 90 days.  They closed on the deal for

16    Via, and all of a sudden, they need all of this cash, right?

17    They need now $260 million more a year than they needed, plus

18    have short-term cash needs.  So they're bleeding cash.  They

19    need more cash.  They have this Standby Equity Purchase

20    Agreement where they can sell stock to YA in exchange for cash,

21    but they can't use it.  Now, all of a sudden, they need to use

22    it.

23          And so we also believe that one of the reasons they

24    did what they did was -- and then they wound up sending

25    advanced notices -- was, all right, we'll say that because of

N3VZZACUCNK

1    the allegations against Mr. Peizer, the agreement with Acuitas

2    Capital is null and void, then they send immediately or shortly

3    thereafter, advance notices through SEPA saying, give me money,

4    and they get it.

5          THE COURT:  Okay.  Next question:  Ideanomics says

6    that this is a non-irreparable harm.  In other words, even if

7    you don't convert now, either you could convert later or you

8    could articulate a theory of monetary damage that would allow

9    you to make good.  What's wrong with that argument?

10          MR. KRATENSTEIN:  Well, your Honor –– and I know

11    you're familiar with the case law here –– all you have to do is

12    read their 10-K.  I mean, it is rife with disclosures about the

13    perilous state of this company's affairs.  We are concerned

14    that if we have to litigate this case fully, which could take

15    months or longer, that the company may not here by the time we

16    get a monetary ––

17          THE COURT:  Right.  I got that.  So let's play that

18    out.

19          MR. KRATENSTEIN:  Okay.

20          THE COURT:  Suppose one assumes that Ideanomics's

21    public disclosures are a foreshadowing of a bankruptcy filing.

22    What good does it do you to have their shares?

23          MR. KRATENSTEIN:  None, because they're worthless.

24          THE COURT:  So if it's bad enough to lead to

25    bankruptcy, you're out of luck either way?

N3VZZACUCNK

1      MR. KRATENSTEIN:  Not necessarily.  Time is important.

2           So when Acuitas Capital made this investment -- and

3      this is actually a point made by Ideanomics -- it knew that the

4      company Ideanomics was in some distress.  That is why the

5      transaction was structured as essentially a 90-day transaction.

6      We'll give you $20 million; you'll give us these convertible

7      securities; you'll be locked up for 90 days; everybody

8      understood that was so that the convertible securities could be

9      exercised in that time and sold without there being dilution

10     from other sources.

11          THE COURT:  I see.  In other words, the value to you

12     is you're hoping that the company will survive but you can sell

13     the shares in the interim and hope that the stock prices

14     bounced a bit so that you make back more than your $20 million?

15          MR. KRATENSTEIN:  Yes.  We're giving them essentially

16     what is -- what wound up being a short-term capital infusion in

17     exchange for stock.  And then the deal is now we can sell that

18     stock within the 90 days without risk of dilution.  And we

19     believe, we obviously went to -- Acuitas Capital obviously

20     wouldn't have made the deal if it did not think that Ideanomics

21     was going to survive at least 90 days.

22          THE COURT:  Right.  Okay.

23          MR. KRATENSTEIN:  But now we're talking beyond that.

24          THE COURT:  The value to you is either, in the short

25     term, selling it, or, in the long term, that it not go

N3VZZACUCNK

1    bankrupt.

2              I suppose there's a scenario under which the company

3    goes bankrupt but the shares are not valueless, depending on

4    what the intellectual property, or whatever, fetches.

5              MR. KRATENSTEIN:  Yes.  I suppose.  And not being a

6    bankruptcy expert, I mean, in my experience in bankruptcy, it's

7    very hard for the equity holders to get very much, if anything.

8    Usually the debt is ahead of that, as you know.

9              THE COURT:  Right.

10              MR. KRATENSTEIN:  So if there's a bankruptcy, I am

11    reasonably confident saying that Acuitas Capital's stock would

12    be worthless.

13              That said, your original point is correct:  Acuitas

14    Capital had optionality.  If it wanted to get out in 90 days,

15    sell the stock, convert it and sell the stock, that was its

16    right.  If it wanted to hold the stock because something good

17    happened to the company in 90 days, got more -- whatever, some

18    good news, they could have done that too.  That's up to them.

19    They bought that optionality.

20              THE COURT:  Okay.  Next question involves the shares

21    sales to YA.  I take it your view is that that's a

22    between-the-eyes breach of the agreement you have?

23              MR. KRATENSTEIN:  Correct.

24              THE COURT:  And one of the pieces of relief that you

25    seek in your reply brief is to extend the lock-up by another 48

N3VZZACUCNK

1    days?

2              MR. KRATENSTEIN:  Correct.

3              THE COURT:  I take it I don't need to decide that now.

4    From your perspective, all that I need to do here is enforce

5    the lock-up through May 2nd and you can brief next week

6    whether to add 48 days to that, but one of the concerns I have

7    in the reply brief request, only as a matter of process, that

8    came in overnight.  The other side is entitled to respond.

9    Nothing turns to you, for now, on whether you get relief

10   through May 2nd or May 2nd plus 48 days?

11             MR. KRATENSTEIN:  Not at this moment.  As long as it's

12   decided before May 2nd --

13             THE COURT:  May 2nd.

14             MR. KRATENSTEIN:  -- then we're fine.

15             THE COURT:  Okay.  Next question:  Do you know what's

16   become of the money that was received by Ideanomics pursuant to

17   selling shares to YA?

18             MR. KRATENSTEIN:  No.  We assume it was used for

19   operations, but we don't know.

20             THE COURT:  But I assume you're asking me to lock that

21   up?

22             MR. KRATENSTEIN:  Actually, we did have a footnote.

23   In the same footnote you're talking about, we said, and the

24   other thing you could do is attach that three plus million

25   dollars.  In our proposed order, because we asked for an

N3VZZACUCNK

| | |
|---|---|
| 1 | extension of the lock-up, we didn't include that because we |
| 2 | felt that that relief would get us where we needed to be |
| 3 | without having to attach any funds. |
| 4 | THE COURT:  Well, look, it seems to me that the right |
| 5 | answer here, if you're right, is, to the extent that Ideanomics |
| 6 | hasn't spent that money, it shouldn't be spending it. |
| 7 | MR. KRATENSTEIN:  I mean, we don't -- |
| 8 | THE COURT:  That just seems to me that if that's a |
| 9 | breach, you know, maybe they can work out some arrangement with |
| 10 | you, but at the end of the day, that money needs to be |
| 11 | available potentially for you. |
| 12 | MR. KRATENSTEIN:  We don't disagree. |
| 13 | THE COURT:  Okay.  All right. |
| 14 | Okay.  Mr. Bordetsky. |
| 15 | MR. BORDETSKY:  Your Honor. |
| 16 | THE COURT:  First of all, I appreciate that I am amply |
| 17 | able to distinguish between outside and inside counsel.  So |
| 18 | don't take the tone as personal. |
| 19 | MR. BORDETSKY:  I do not, your Honor. |
| 20 | THE COURT:  But it looks as if your general counsel |
| 21 | skipped a couple of years of law school.  What's with this |
| 22 | insider trading theory?  That's just bonkers. |
| 23 | MR. BORDETSKY:  So a few points on that, your Honor -- |
| 24 | THE COURT:  That's just character assassination. |
| 25 | MR. BORDETSKY:  Well, the documents -- |

N3VZZACUCNK

1          Let me take a step back because you're asking me a

2    thought process of someone, and we put together papers, so

3    allow me to provide the Court --

4          THE COURT:  Sure.  Look, but let me, just because time

5    is short --

6          MR. BORDETSKY:  Understood.

7          THE COURT:  -- is Ideanomics still pursuing the theory

8    that this California indictment of an executive of Acuitas

9    involving alleged insider trading in a separate entity has some

10   bearing on Acuitas Capital LLC's conversion rights?  If you're

11   not pursuing the argument, we can move past it.

12         MR. BORDETSKY:  No.  We are, your Honor, because the

13   position is this -- and if I didn't clarify it in my papers my

14   apologies -- that Mr. Peizer is the CEO of what I'm going to

15   call Holding, the entity to which he is codefendant in the SEC

16   action, as well as Capital.  And we've provided the Court with

17   papers that identify the fact that as the CEO, he controls

18   everything in terms of what's going where.  And we've got

19   examples of the fact that, I believe, it was either the *Crede*

20   or the *FingerMotion* papers that we attached, your Honor, where

21   in essence, the statement says on the 13G filing where we,

22   Holding, are acquiring the shares that Capital has.  So the

23   concern that we have, your Honor, is that if the insider

24   trading -- if there were funds that were improperly utilized,

25   received, and were put into Holding, because I don't think

N3VZZACUCNK

1    there's a dispute that the funds at issue were put into

2    Holding, if Holding funded Capital and those funds were then

3    utilized for the purposes of the investment into my client for

4    the purpose of then utilizing the shares and the warrants to

5    get a return, a significant return on it, it's washing.

6                THE COURT:  Okay.

7                MR. BORDETSKY:  That's the concern that we had.

8                THE COURT:  Okay.  Let me work this through.

9                MR. BORDETSKY:  Yes.

10                THE COURT:  Your argument doesn't turn on this CEO's

11    character.  So far as you're concerned, he could be Mother

12    Teresa, Jack the Ripper, or anything in between, it doesn't

13    matter, your concern is that if it's dirty money that was used

14    to fund the $20 million in Ideanomics, there would be a

15    scenario under which that money could be forfeited or something

16    like that?

17                MR. BORDETSKY:  Absolutely.

18                THE COURT:  Am I articulating that right?

19                MR. BORDETSKY:  That is correct.  And to be clear, we

20    didn't -- we did mention the felony conviction of Mr. Wachs,

21    but we didn't -- this wasn't an attempt at a character

22    assassination.

23                THE COURT:  Well, wait a minute.

24                MR. BORDETSKY:  But the concern was that there's --

25    there's an allegation that, as a public company, we cannot be

N3VZZACUCNK

1   included in any of that.

2           THE COURT:  All right.  But the logic chain here is

3   effectively a forfeiture one?

4           MR. BORDETSKY:  Absolutely.

5           THE COURT:  That it's dirty money?

6           MR. BORDETSKY:  Absolutely.

7           THE COURT:  All right.  Apart from that possibility --

8           MR. BORDETSKY:  Yes.

9           THE COURT:  -- do you have anything concrete that says

10  that the money that the CEO ostensibly used to buy the shares

11  that are the subject of the insider trading charge, any factual

12  basis to contend that that's the same money that essentially

13  wound up being used to fund Ideanomics?  I mean, is it just

14  speculation?

15          MR. BORDETSKY:  So the quick answer is, no.

16          It's always good to answer a judge, the question

17  that's asked.

18          THE COURT:  Thank you.

19          MR. BORDETSKY:  But the concern, your Honor, that we

20  have is with respect to -- the allegations are not amorphous.

21  The allegations don't come from perhaps a business partner who

22  was upset with respect to the process.  The allegations come

23  from the Securities and Exchange Commission and the Department

24  of Justice.

25          And while I appreciate they are just allegations, my

N3VZZACUCNK

1  client's obligations -- my client's obligation is to its

2  shareholders.

3  　　　　　THE COURT:  I know.  I mean, look, I mean, I

4  appreciate that, but that truism doesn't mean that you can

5  speculate.  I mean, there's no concrete basis to think that

6  Ideanomics was just funded with dirty money.  If so, I assume

7  you'd be happy to give it back right now.

8  　　　　　MR. BORDETSKY:  We've actually --

9  　　　　　THE COURT:  Let me ask you this:  Why don't you just

10  give Acuitas back its $20 million?

11  　　　　　MR. BORDETSKY:  We are --

12  　　　　　I'm sorry.

13  　　　　　THE COURT:  If you're concerned about it being

14  radioactive money, give the money back.  I'm sure they, at this

15  point, given what's happened, they would be happy to take a

16  mulligan.

17  　　　　　MR. BORDETSKY:  The interesting point on that, your

18  Honor, is prior, in terms of the discussions back and forth

19  with the parties, there was that discussion of, we will give

20  that plus --

21  　　　　　THE COURT:  Right.

22  　　　　　MR. BORDETSKY:  -- a sweetener, if you will, and that

23  was rejected, but with respect to the funds -- the funds aren't

24  there.

25  　　　　　THE COURT:  That's the problem.

N3VZZACUCNK

1          MR. BORDETSKY:  To be clear, the funds aren't there.

2          But what we said was, and we put this in the papers

3     that, to the extent that -- and I'm hopeful the Court will ask

4     questions with respect to the irreparable harm --

5          THE COURT:  I'll get there.

6          MR. BORDETSKY:  -- and with respect to the 15(a), but

7     what we said was, look, if the Court wants us to deposit the

8     shares with the Court, let's let the parties who would contend

9     that there's an issue, let them resolve it.

10         THE COURT:  But, look, here's the issue:  First of

11    all, it's speculative that there was dirty money; but, second

12    of all, even if there were, that wouldn't make the shares that

13    were then exchanged themselves dirty.  And to the extent the

14    concern is getting your money back, Acuitas Capital has

15    offered, if it chose to sell the shares that it gains by

16    conversion, to escrow those proceeds.  So one way or the other,

17    I'm not following how the unresolved indictment of this

18    individual has any bearing here.

19         MR. BORDETSKY:  So our understanding, my

20    understanding, with respect to the forfeitures that, to use the

21    Court's phrase of "dirty money", that if that -- an investment

22    down the line associated with those originating funds that are

23    dirty, that investment is subject to forfeiture and that

24    investment is problematic and that investment can be a target

25    for a clawback.

N3VZZACUCNK

1          And that's the concern and that's what we indicated in

2     correspondence, and that's why we dropped the foot -- the

3     statement in the papers of, have the Court order us to put it

4     in the --

5          THE COURT:  All right.

6          MR. BORDETSKY:  -- with the Court, deposit it with the

7     Clerk.

8          THE COURT:  Okay.  Let's turn to the 15(a) point.

9          MR. BORDETSKY:  Yes.

10          THE COURT:  Give me the one-minute version of that.

11          MR. BORDETSKY:  Not desperation.  To be clear, to be

12     clear, when I got the papers Monday, I'm familiar with the

13     arguments.  The reality is here that this is an entity whose

14     business is set up for the purpose of acquiring shares directly

15     from the issuers at a discounted rate, to sell those shares

16     directly into the marketplace for its own benefit through its

17     own account.  That is the indicia of a dealer, and the law says

18     that if this is the --

19          THE COURT:  That's not a dealer.  That's somebody who

20     is a day trader.  That's a short-term trader.

21          MR. BORDETSKY:  Respectfully, your Honor --

22          THE COURT:  A dealer is like a market maker, something

23     like that.  This is not somebody who is making markets.  This

24     is an entity that, you know, viewed cynically -- but nothing

25     wrong with that -- sees an opportunity for a quick profit.

N3VZZACUCNK

1          MR. BORDETSKY:  So I would disagree with the Court's

2     interpretation.  I had the opportunity to brief this issue

3     distinctly, and counsel is correct:  The Southern District has

4     repeatedly said if a transaction can otherwise be effectuated

5     without -- without a securities transaction, then it's not a

6     security.

7          We believe -- on Monday, your Honor, in the case of

8     *EMA Financial v. Joey New York*, the Second Circuit heard a

9     small bit of argument on this issue.  The usury claim, I think,

10    is going to subsume that case, but it hasn't been resolved in

11    the Second Circuit.  And there is a split because the circuits

12    in the cases that have found dealer, regardless of whether it's

13    an individual, if the person or entity is doing this as their

14    business to acquire -- the day trader, your Honor, is not

15    buying securities directly from the issuer.  The day trader is

16    going into the market.

17          And by virtue of the SPA, the differential between the

18    SPA case, which we have here, versus the cases which have been

19    deemed not to be securities, and while I take -- while I

20    disagree with that whole thing and am hopeful that we get to

21    the Second Circuit on that, but there's a distinct difference

22    here.  With the promissory note cases, which was the totality

23    of the cases, one was before Judge Carter on this issue, the

24    Court found as follows:  The note itself identified two options

25    for repayment.  You could repay cash at the 12 percent

N3VZZACUCNK

```
1    interest, or we can execute the conversions at a discounted

2    rate, 40 percent to market.  I'm pulling a number up.  And the

3    courts held, beginning with Judge Sullivan in, I believe, the

4    LG case, because that option is there, it's not a security.

5         Here, your Honor, the moment -- they can't enter into

6    the transaction.  The SPA is a securities transaction in and of

7    itself.  That's one.  Two, all they're doing is effectuating

8    securities transactions throughout this.  The moment that they

9    send the funds in lieu of the shares --

10        THE COURT:  Wait.  So your client, you're saying,

11   knowingly participated in an illegal contract?  In other

12   words --

13        MR. BORDETSKY:  So, no, is the answer --

14        THE COURT:  In other words, if the agreement is

15   illegal, that would be true regardless of the attempt to carry

16   it out here.

17        MR. BORDETSKY:  Well, as to the success-on-the-merits

18   claim here, your Honor, our position is you can't even get to

19   the contract because the issue that has to be resolved -- the

20   contract -- the law says the contracts are voidable at the

21   option of the counter-party.

22        THE COURT:  Well, why did your client enter into an

23   agreement which it now is saying has, at its root, an

24   illegality?

25        MR. BORDETSKY:  Didn't know.  Didn't know, your Honor.
```

N3VZZACUCNK

1         THE COURT:  Because it didn't read the law?  I mean,

2    it's not that there's some fact that has changed.

3         MR. BORDETSKY:  Well --

4         THE COURT:  You're saying that on the face of

5    agreement, this was impermissible?

6         MR. BORDETSKY:  They did not know and they --

7    Ideanomics didn't know that to effectuate these transactions

8    the plaintiff had to be a registered dealer.  And in fairness

9    to the process, the SEC has been pursuing this for the last --

10   I'm going to use a round number, your Honor -- five years with

11   respect to this.

12        And there was a case out of the Southern District of

13   Florida, *Allagarby* -- in fairness, it wasn't briefed, I want to

14   make that clear -- where the Court said of an individual who

15   had 115 of these trades, you're a dealer, you're not a trader,

16   you're a dealer, and the process itself requires a substantial

17   fact-finding because, if, in fact, this is an illegal or if

18   this is a voidable contract, your Honor, we don't get to the

19   success-on-the-merits claim because there's no contract to

20   enforce.

21        So that's our position with respect to the process

22   because, again, your Honor, they're getting this at a discount,

23   that there's risk.  When my friend says, there's risks, so,

24   therefore, we're not a dealer, with deference to my friend's

25   argument, that's just not accurate, because if I choose to fund

N3VZZACUCNK

1  an entity with this very note, there's always a risk that the

2  company goes out of business tomorrow.  It's a risk --

3           THE COURT:  Let me turn to irreparable harm.

4           MR. BORDETSKY:  Yes.

5           THE COURT:  What's wrong with the argument that if

6  Acuitas doesn't convert now it may never be able to convert?

7           MR. BORDETSKY:  You heard in response to that question

8  to the plaintiff that they can sell it, there's a dollar amount

9  there -- the moment that the Court heard we can sell it, we can

10  sell the shares, we want to sell the shares, we provided this

11  Court to the dollar what the initial tranche was valued at.

12           THE COURT:  Right.

13           MR. BORDETSKY:  Damages associated with a failure to

14  convert are easily calculable.

15           THE COURT:  Sorry.  Look, here's the problem:  That

16  works better if your client is durably going to be there and

17  capitalized, but the client's public financials are all but

18  screaming, we're on fumes.

19           MR. BORDETSKY:  Sure.

20           THE COURT:  And so if you operate on the assumption

21  that the best way for Acuitas Capital to salvage some of its

22  investment is to convert and do what it can by selling the

23  shares but that two weeks from now, there may be no market for

24  them, is there some money that Ideanomics has set aside for

25  Acuitas Capital so that when it files its breach of contract

N3VZZACUCNK

1    suit here, it will be able to recover it —— that is, money that

2    is outside of bankruptcy?  I mean, I'm not seeing, in a

3    concrete world, a route to a recovery here if you assume the

4    worst.

5           MR. BORDETSKY:  So allow me to answer the question and

6    then address a point that was raised by the Court.

7           THE COURT:  Just answer my question, please.

8           MR. BORDETSKY:  Yes.  So the question is, I don't know

9    whether the funds have been set aside.  I can't --

10          THE COURT:  But it was a rhetorical question.  If

11   there was a bankruptcy, unless there was some priority position

12   that Acuitas had, it can't just set aside money for Acuitas.

13   That would be available to all the other claimants.  It was a

14   rhetorical point --

15          MR. BORDETSKY:  Sorry.

16          THE COURT:  -- which is my way of saying, if they

17   don't convert now and at least do what they can in the market

18   with these shares, they may get nothing for their $20 million,

19   and Acuitas Capital -- and Ideanomics is not the Fed.  There's

20   no money it can attach.

21          MR. BORDETSKY:  Sure.  To respond to that, your Honor,

22   a few different points:  The same argument was raised in the

23   *Crede* case before Justice Sherwood.

24          And by the way, I owe both this Court and Justice

25   Sherwood, your colleague in New York Supreme -- with a name

N3VZZACUCNK

1    like Bordetsky, I shouldn't misspell a name.  So, my apologies.

2                THE COURT:  Sorry.  Time is short.

3                MR. BORDETSKY:  It's the same argument, your Honor.

4    There's this metrics of insolvency.  We're going to show you

5    the public filings.  And Judge Sherwood, again, we attached the

6    papers because it was -- it was incredible, the almost near

7    identical nature of the argument, and Judge Sherwood said, just

8    because --

9                THE COURT:  No disrespect.  I'm in Federal Court.  I

10   don't care.  I want to --

11               MR. BORDETSKY:  Fair enough.

12               Then let me go to Judge Carter in the *EMA v. Vystar*

13   case and Judge Spatt in the *Vis* case, which they said in

14   essence, no, if this isn't available, the possibility,

15   everything that you're hearing from the plaintiff is maybe,

16   possibility, it may be, and they actually refer to --

17               THE COURT:  No.  No.  No.  Possibility, maybe,

18   speculative is there was dirty money used in the investment.

19   The plaintiffs are citing to statements made by your client

20   that suggest that the company is on life support.

21               MR. BORDETSKY:  So if I can address that, your Honor,

22   we got a letter with -- your Honor identified the filings, and

23   yesterday we got a letter from the plaintiff that broke down

24   the filings, and we had -- counsel and I had some confusion as

25   to what was going to take place today.  And this morning, I

N3VZZACUCNK

| | |
|---|---|
| 1 | sent the Court a breakdown associated with the filing.  And I |
| 2 | don't know if the Court had the opportunity to look at the |
| 3 | March 31st letter, which is document number 40, but if it did |
| 4 | or if it will, it will find that the quotes were taken -- an |
| 5 | 8-K filing -- a 10-K filing, your Honor, is a public company |
| 6 | saying, the world could fall apart, if you're going to invest, |
| 7 | the world could fall apart, and put every single possible |
| 8 | problem, and in the 8-K that was filed for the year 2021, that |
| 9 | was filed September 2, 2022, the very quotes that are |
| 10 | utilized -- |
| 11 | THE COURT:  But -- |
| 12 | MR. BORDETSKY:  -- but it's a constant, your Honor.  I |
| 13 | guess that's my point.  They wanted -- |
| 14 | THE COURT:  The stock price now is what? |
| 15 | MR. BORDETSKY:  Same, 11-ish, 11 cents. |
| 16 | THE COURT:  11 cents? |
| 17 | MR. BORDETSKY:  Yes. |
| 18 | THE COURT:  Okay.  What was it at the time of the |
| 19 | contract between Acuitas and Ideanomics? |
| 20 | MR. BORDETSKY:  So it was -- 28 cents.  After the |
| 21 | first sale, that went to 16 cents.  And we've got the exact |
| 22 | numbers in our papers.  Then after the second sale by -- it |
| 23 | went to 13 or 12. |
| 24 | THE COURT:  And what was it in September? |
| 25 | MR. BORDETSKY:  What was it in September? |

N3VZZACUCNK

1          THE COURT:  When you say the same quotes appeared.

2          MR. BORDETSKY:  September of '22?

3          THE COURT:  Whatever you said, you said that these

4     quotes are recycled.

5          MR. BORDETSKY:  I don't have that.  I think it's in

6     one of the sets of papers.  I don't have that to memory.

7          THE COURT:  I mean, look, everything I've read here

8     suggests that it's --

9          MR. BORDETSKY:  But this is --

10         THE COURT:  -- that your client is circling the drain.

11         MR. BORDETSKY:  But, your Honor, with deference to

12    plaintiff's position, that's what they do.  They come into

13    companies that -- we concede.  We are a growth --

14    emerging-growth company.  We take money.  We don't doubt that.

15    They're saying in the first instance, we review all your

16    financials because in the SPA no less than twelve times, they

17    identify the SPA reports.  We've reviewed it.  They don't

18    contest that.  And now what they're saying is, aha, now we're

19    going to use the very information that we knew of prior to

20    investing to say you're falling apart.

21         THE COURT:  All right.

22         MR. BORDETSKY:  It doesn't make sense, your Honor.

23         THE COURT:  Mr. Bordetsky, let me ask you this:  Let's

24    assume, for argument's sake, that your client was informed that

25    its reasons for claiming illegality of the contract or that it

N3VZZACUCNK

would be getting too close to dirty money were it to perform

were rejected such that your client did not have a basis to not

comply with the contract.  Is there some reason it doesn't want

to?

          MR. BORDETSKY:  No.

          THE COURT:  Great.

          MR. BORDETSKY:  I mean, the letter from my --

          THE COURT:  I mean, in other words, I was exploring

with your adversary, why, as a matter of tactics or strategy,

Ideanomics seemed to be resisting complying with a clear

contractual obligation and why the excuses it was giving struck

the Court as unpersuasive, shall we say, and I was exploring

with your adversary, as a matter of business logic, why it

might be that Ideanomics didn't want to convert.

          Are you telling me if we get rid of the ostensibly

principled reasons that Ideanomics has articulated, insider

trading or a dealer, get rid of those things, are you telling

me that Ideanomics is happy to comply with its contractual

obligation, there's no harm to it?

          MR. BORDETSKY:  I'm saying at -- if, on the merits of

the case, after discovery has demonstrated that this may be --

          THE COURT:  No.  No.  No.  I'm just saying, just

indulge this.  You made your arguments --

          MR. BORDETSKY:  This hypothetical?

          THE COURT:  Look, you have to answer the question or I

N3VZZACUCNK

1     assume the worst.  The question is as follows:  You've given me

2     a couple of arguments --

3               MR. BORDETSKY:  Yes.

4               THE COURT:  -- you can tell I'm not buying.  Assume

5     that that sticks and I don't buy either the insider trading or

6     the dealer rationalizations.  Is there some business reason why

7     it is against your client's interest to convert?

8               MR. BORDETSKY:  They -- the only reason that they

9     didn't -- No.

10              THE COURT:  And is there any impediment at this point

11    in converting?

12              MR. BORDETSKY:  I can't speak to that.  I can't speak

13    to that now, your Honor, in terms of the process, particularly

14    in light of the fact that, as we've indicated with the plethora

15    of authority from this district, Courts are loath to issue

16    conjunctive relief on conversion issues, on this very issue.

17              THE COURT:  May I ask you, your client agreed that the

18    harm would be irreparable?  I mean, that's part of the

19    agreement.

20              MR. BORDETSKY:  May I address that, your Honor?

21              THE COURT:  Briefly.

22              MR. BORDETSKY:  Because this issue came up in the *EMA*

23    case, and Judge Carter provided a wonderful analysis associated

24    with this.  It's persuasive; it's not dispositive --

25              THE COURT:  I know that.

N3VZZACUCNK

1          MR. BORDETSKY:  -- and the first question is, are the

2     stocks --

3          THE COURT:  But it's persuasive but your client said

4     it and it is now saying something different.

5          MR. BORDETSKY:  So, thus, there's an analysis that

6     takes place.  The first analysis, is this a unique trading

7     stock.  The answer is, no.  There's no allegation to it.

8     There's no mention in the papers to it.

9          The second analysis that has to be conducted in terms

10    of this process, is, is this is a publicly traded stock where

11    the shares are available?  And the answer is, yes.

12         The next aspect is the insolvency issue, and this very

13    type of analysis that plaintiff has provided to the Court was

14    provided in the *EMA* case and it was provided in the *Vis* case.

15    And it was rejected -- and it was rejected on the grounds that

16    you cannot just simply say, well, maybe, sort of, it may be.

17    The law is clear in this district that with respect to

18    conversions, when there's a dollar amount that can be resolved,

19    that the breach of contract -- and if it can be resolved by a

20    dollar amount, whether that's available or not, is, in fact, a

21    reason to reject an application.

22         THE COURT:  Does your client have the shares available

23    to convert, if it converted at today's stock price, the amount

24    that Acuitas is entitled to?  Does it have the --

25         MR. BORDETSKY:  You mean the two tranches?

N3VZZACUCNK

| | |
|---|---|
| 1 | THE COURT:  Does it have the headroom to carry those |
| 2 | out? |
| 3 | MR. BORDETSKY:  I believe so.  The two tranches? |
| 4 | THE COURT:  All right.  I'm asking -- |
| 5 | MR. BORDETSKY:  I believe so.  I can't -- I can't |
| 6 | definitively answer that, your Honor, but I do believe that |
| 7 | they do. |
| 8 | THE COURT:  Look, I'm not -- |
| 9 | MR. BORDETSKY:  We offered to put it with the Court |
| 10 | and I wouldn't have made that -- |
| 11 | THE COURT:  What I'm not hearing is any articulation |
| 12 | of any equity why your client -- if I reject the idea that |
| 13 | there's an illegality, what I haven't heard is word one of why |
| 14 | there's some equity in the balance that would favor your |
| 15 | client. |
| 16 | Let me ask you this -- |
| 17 | MR. BORDETSKY:  Well -- |
| 18 | THE COURT:  Let me ask you this next question. |
| 19 | MR. BORDETSKY:  Sure. |
| 20 | THE COURT:  Assuming that the SPA is valid, was it |
| 21 | lawful for your client to sell the shares to YA, assuming that |
| 22 | the SPA is valid? |
| 23 | MR. BORDETSKY:  Was it -- |
| 24 | THE COURT:  Was it a breach of the SPA? |
| 25 | MR. BORDETSKY:  I think that's an interpretation in |

N3VZZACUCNK

1   terms of the process.

2           THE COURT:  Well --

3           MR. BORDETSKY:  I can't, you know, we're --

4           THE COURT:  You're not prepared to defend it?

5           MR. BORDETSKY:  No.  At this --

6           THE COURT:  I mean --

7           MR. BORDETSKY:  The language in the contract is clear.

8   We don't dispute that.

9           THE COURT:  I mean, look, I'm giving you a chance here

10  because it looks like a between-the-eyes breach, based on your

11  client's say-so, that its antecedent agreement with Acuitas is

12  null and void.  But if you assume the opposite, which is that

13  it's a valid agreement, is there a responsible argument a

14  lawyer can make as to why the sale to YA was not a breach?

15          MR. BORDETSKY:  Sure.  It's -- again, it's a tie-in

16  because I think the position of the -- of Ideanomics is that we

17  had an agreement that there was a breach by virtue of the

18  funding issue, and that there was -- there's an issue with

19  respect to the enforceability, and, therefore --

20          THE COURT:  Why did you not go to a court to seek a

21  declaratory judgment?  In other words, if your theory about

22  selling to YA is, we think that our agreement with Acuitas is

23  illegal, but we recognize that if it's not null and void, we're

24  breaching it, why not do what the other side did, go to court,

25  get a declaratory judgment, instead of the self-help of saying,

N3VZZACUCNK

1  we declare it's illegal and we're now going to sell to YA.

2          MR. BORDETSKY:  I can't speak to before I was

3  involved.

4          THE COURT:  Was that before your time?

5          MR. BORDETSKY:  I can't speak to that.

6          THE COURT:  Were you retained --

7          MR. BORDETSKY:  I was retained Monday, your Honor.

8          THE COURT:  Okay.

9          MR. BORDETSKY:  Monday afternoon.  So I cannot speak

10  to that.

11          THE COURT:  Okay.

12          MR. BORDETSKY:  And, you know, there is a distinct

13  difference between a litigator versus an in-house counsel

14  that's far removed from the process.

15          THE COURT:  You know what, that's where I began with

16  you and I'll end with that as well.

17          Let me just follow up with plaintiff's counsel on a

18  few things.

19          MR. KRATENSTEIN:  Yes, your Honor.

20          THE COURT:  I'm sorry.  One other question,

21  Mr. Bordetsky, and you may not know the answer.

22          MR. BORDETSKY:  Yes, sir.

23          THE COURT:  What's become of the fruits of the sale to

24  YA?

25          MR. BORDETSKY:  I can't speak to that.

N3VZZACUCNK

1          THE COURT:  All right.  Thank you.

2          MR. BORDETSKY:  I can't speak to that.

3          THE COURT:  Look, I want to come back to the dealer

4     point.

5          MR. KRATENSTEIN:  Yes.

6          THE COURT:  Give me, as succinctly as you can, your

7     best response to that, informed now by what you've heard from

8     Mr. Bordetsky.

9          MR. KRATENSTEIN:  It's a multifactor test as whether

10    you're a dealer.  There are such a thing as investors, there

11    are traders, there are brokers, and there are dealers.  Here,

12    you have an investor and/or a trader.  They invest in

13    companies.  They make money from companies.  One of the key

14    factors that Courts look at in the multifactor test is how much

15    risk was the investor taking.  Here, there was plenty of risk,

16    including as demonstrated by the fact that I'm standing here

17    today, but putting that aside, even if I wasn't standing here

18    today -- and we enumerated several of these risks in our

19    papers -- there was the risk that the shares might not be

20    registered.  And, in fact, there was a delay in the

21    registration, which is one of the reasons that we were under --

22    that Acuitas Capital was under some time pressure to convert

23    and sell.

24          There's also, of course, the danger -- the risks

25    concerning the stock price.  I want to talk briefly about the

N3VZZACUCNK

```
 1    First and Fifth Circuit cases that they rely on.  In those
 2    cases, on the face of the contracts themselves, these were
 3    broker-dealers who were hired specifically to sell stock, and
 4    the Aptech case that we cited from this district goes through
 5    that chapter and verse.
 6           THE COURT:  Your client is not a broker-dealer?
 7           MR. KRATENSTEIN:  No.
 8           THE COURT:  Has your client ever been a broker-dealer?
 9           MR. KRATENSTEIN:  Not to my knowledge.
10           THE COURT:  What line is Acuitas in?
11           MR. KRATENSTEIN:  They invest in companies.
12           THE COURT:  Go ahead.
13           MR. KRATENSTEIN:  So that's the answer to the dealer
14    point, your Honor.
15           THE COURT:  Okay.  All right.  Assuming that relief
16    substantially along the lines of where you are seeking is
17    granted, and assuming for the time being that the May 2nd
18    rather than the June 19th date is used, presumably you don't
19    have an interest in driving Ideanomics into bankruptcy, your
20    client's interests are better served in finding a way to work
21    with them to salvage something, hopefully.  Right?
22           MR. KRATENSTEIN:  Yes.
23           THE COURT:  I mean, otherwise, yes, maybe you can sell
24    this penny stock in the market and get a little something for
25    it, vanishingly little, maybe even more vanishingly, depending
```

N3VZZACUCNK

on what the restrictions are.  What's the game plan?  I mean,

in other words, if you get this relief, it enhances your

bargaining power.  But what's the game plan in working with

Ideanomics to hopefully do something productive here?

MR. KRATENSTEIN:  Right.  Well, let me take a step

back, and I appreciate the question.

As you know from the papers, there was a buyout

discussion and there was a disagreement between the parties as

to the economics of that buyout and whether it would work.  And

one of the reasons -- which is in the papers, so I don't think

I'm giving anything away here -- was that my client felt like

it was taking a risk and didn't just want to get its investment

back, it wanted a return on the investment.  And then the talks

broke down, and then there was the repudiation of the contract.

So now we're left with the option of, all right, they

apparently don't want to talk to us anymore.  That's where the

discussions stopped.  They sent us the March 7th letter

repudiating.  Now we have to go running to court.  Now we have

to try to get this stopped and just do the best we can, as you

said.  I don't know what happens next between them.  I suppose

a business discussion could happen.

Acuitas Capital was put in the unenviable position of

just now trying to salvage the situation.  I can only speculate

about whether there's a business deal that could now be reached

that might be beneficial to the parties.

N3VZZACUCNK

1    THE COURT:  Right.  Look, I mean, I guess where I'm

2    going is, just because you have your contract price doesn't

3    mean that you have ultimately an interest in burning down

4    Ideanomics.

5    MR. KRATENSTEIN:  Of course not.

6    THE COURT:  So, yes, it's possible that your client's

7    best interests will be served by converting at -- hypothetical

8    here -- at 11 cents, and then selling it at 7 cents or whatever

9    it's trading at on Tuesday.  It's also possible that with the

10   benefit of the Court's enforcing your contract rights there's a

11   little more of alignment of interest between the two tables

12   here and your bargaining power will be greater than it was

13   yesterday in a few days, business days, from now, and maybe,

14   working together, there's some way of salvaging something here.

15   I'm not in the middle of settling this right now, but

16   I am noting that notwithstanding the antagonism here, the

17   relief you get in the short term has you as bedfellows.

18   MR. KRATENSTEIN:  I don't disagree with anything you

19   just said.

20   THE COURT:  So what's your client's headspace about

21   this?

22   MR. KRATENSTEIN:  Well, I don't want to -- I don't

23   want to violate -- let me say this, I feel comfortable saying

24   this:  After we filed this motion, we did make a proposal.  I

25   don't want to get into the substance of that proposal because I

N3VZZACUCNK

1   don't think that that would be appropriate.

2           THE COURT:  No.

3           MR. KRATENSTEIN:  But we did make a proposal that we

4   thought could resolve this that would be fair to both parties

5   and that proposal was not accepted.

6           I do not know if, depending on how this Court's ruling

7   goes, the parties will then, as they often do after an

8   important Court ruling, say, all right, here's what the Court

9   has said, now we both need to reassess where we are and have

10  another discussion.

11          THE COURT:  All right.  I mean, look, I'm making this

12  point.  This is born of eleven and a half years' experience on

13  the bench.  One of the best things I can do is provide clarity

14  because uncertainty, legal uncertainty is one of the great

15  problems, and when a Court at least puts people in a better

16  position to arrive at the same expected value of things, they

17  tend to settle and work better together.  One of the reasons I

18  wanted to have you here was to resolve what I could as quickly

19  as I could so that together, for better or worse, you're

20  dealing with one less big imponderable, and you will be within

21  an hour dealing with one less big imponderable.  But I hope

22  that everyone emerges with a spirit of trying to find a way to

23  work together.

24          Acuitas may choose to bail and sell.  That's fine.

25  Whatever.  It's entitled to do that and salvage what it can,

N3VZZACUCNK

1    but I would not be happy to learn that the approach was, let's

2    burn the thing down.

3              MR. KRATENSTEIN:  No.  That's not -- that's not --

4    your Honor said it perfectly.  That's not in our interest.  As

5    with any discussion, it takes two to tango, but that's --

6              THE COURT:  Okay.

7              MR. KRATENSTEIN:  What you say is correct and we

8    understand.

9              THE COURT:  All right.  One moment.

10             (Discussion off the record)

11             THE COURT:  Counsel, I'll be back at 4:15 with a bench

12   ruling.

13             MR. BORDETSKY:  Your Honor, may we just address one

14   point.

15             THE COURT:  Briefly.

16             MR. BORDETSKY:  Briefly, just with respect to timing

17   issues.  Based upon receiving the papers and working, the time

18   I got them, the answer is due next week.  We would just like

19   more time --

20             THE COURT:  For the answer to the --

21             MR. BORDETSKY:  For the response to the complaint.

22             THE COURT:  Let's take that up after the break.

23             MR. BORDETSKY:  I just wanted to address it so that

24   the Court, it was on -- counsel and I spoke beforehand.

25             THE COURT:  I won't rule on that pending hearing

N3VZZACUCNK

1   further from you.  But if there's a joint proposal on that, I

2   would be happy to.

3          MR. BORDETSKY:  Great.  Thank you, your Honor.

4          MR. KRATENSTEIN:  Thank you, your Honor.

5          (Recess)

6          (In open court)

7          THE COURT:  Okay.  Be seated.

8          All right.  I have a brief bench ruling to read:

9          I'm now going to issue a ruling on plaintiff Acuitas

10  Capital LLC's motion for a preliminary injunction against

11  defendant Ideanomics, Inc.  For your planning purposes, there

12  will not be a written decision.  I will instead issue a

13  bottom-line order reflecting the Court's resolution of the

14  motion.  To the extent the Court's reasoning is significant to

15  counsel, you will need to order this transcript.

16          Acuitas moves for the Court to enter an order

17  directing Ideanomics to deliver to Acuitas within one business

18  day 4,901,960 registered common shares of Ideanomics stock

19  pursuant to its March 3rd, 2023 conversion notice, and

20  7,974,481 registered common shares of Ideanomics stocks

21  pursuant to its March 6th, 2023 exercise notice.  Acuitas also

22  seeks to enjoin Ideanomics from offering, lending, or otherwise

23  transacting in its shares of capital stock through and

24  including May 2nd, 2023, unless its common stock is trading

25  at least 20% above the conversion price of preferred stock.  In

N3VZZACUCNK

1  its proposed order last night, Acuitas proposed that the

2  May 2nd date be extended by 48 days until June 19th, 2023.

3      I have reviewed in detail the parties' memoranda of

4  law, supporting declarations, end the materials attached to

5  those declarations.  I want to compliment counsel for both

6  sides from their excellent submissions, which have been of

7  tremendous assistance to the Court, and for the energetic

8  colloquy today, which was informative to the Court.

9      The Court adopts the account of facts as provided by

10 Acuitas as Ideanomics has not set forth any meaningfully

11 contrary account.  The relevant facts here are as follows:  On

12 November 14th, 2022, Acuitas and Ideanomics entered into a

13 Securities Purchase Agreement, or the SPA.  Under the terms of

14 the SPA, Acuitas purchased $20 million of convertible

15 securities through three separate investments.  The last of

16 these took place on February 7th, 2023.  The SPA provided for

17 Acuitas to convert the preferred stock that it received into

18 common shares at a specified conversion price.  The SPA also

19 provided a cashless exercise option, under which, if the

20 Ideanomics stock were trading below a specified exercise price,

21 Acuitas could convert its warrants into common shares pursuant

22 to a specified exchange formula.  In exchange for the

23 investment, Ideanomics agreed to a lock-up provision that

24 prohibited it from offering, selling, or otherwise transferring

25 shares of its capital stock for a period of 90 days, ending on

N3VZZACUCNK

1   May 2nd, 2023.  If, however, Ideanomics's common stock was

2   trading at a price at least 20% higher than the price of its

3   preferred stock, Ideanomics would be entitled to sell up to 3%

4   of its outstanding common stock under its Standby Equity

5   Purchase Agreement with YA II PN or YA, a third party to this

6   case.

7          On February 8th, 2023, after Acuitas purchased its

8   third and final tranche of convertible securities, Ideanomics

9   initiated negotiations with Acuitas to secure further

10   investment.  Around this time, on February 2nd, 2023, and

11   February 15th, 2023, Acuitas converted $10 million worth of

12   preferred stock into common stock in two transactions.

13          The parties, however, were ultimately unable to agree

14   on the terms of a buyout.  On February 28th, 2023, Ideanomics

15   sent to Acuitas a draft termination agreement for the SPA that,

16   Acuitas alleges, improperly valued the warrants.  Shortly

17   thereafter, Acuitas attempted two conversions.  First, on

18   March 3rd, 2023, Acuitas sent a Conversion Notice to

19   Ideanomics in order to convert $1 million worth of preferred

20   stock into 4,901,960 registered common shares; and second, on

21   March 6th, 2023, Acuitas sent an Exercise Notice to

22   Ideanomics in order to convert 5,555,555 Warrants into

23   7,974,481 registered common shares.  Ideanomics, however,

24   refused to honor these notices.  Instead, on March 7th, 2023,

25   Ideanomics declared to Acuitas that the SPA was "null and void"

N3VZZACUCNK

due to an indictment of Acuitas's CEO and its parent company
for insider trading.  This, Ideanomics contended, constituted a
breach of the SPA's provision prohibiting the use of funds
derived from illegal activity.

Acuitas represents that Ideanomics is in a precarious
financial position.  That is confirmed by Ideanomics's
declining stock price, which, as of the filing of the pending
motion, was at an all-time low, under 11 cents per share.  It
is also consistent with various warnings and disclosures in
Ideanomics's public filings, albeit ones that had been
articulated in earlier filings.  That Ideanomics is in a
challenging financial position is also corroborated by a
development I will address later, which is Ideanomics's recent
sale of stock to YA.  That sale, insofar as it appears to be a
clear breach of the SPA, bespeaks apparent desperation
suggestive of dire financial straits.

Acuitas now seeks injunctive relief.  It contends that
Ideanomics has breached the SPA by refusing to honor its
Conversion Notice and Exercise Notice.  It contends that
Ideanomics would be unlikely to satisfy any final judgment in
light of its dire financial situation, whereas receiving the
shares to which it is entitled under the SPA would afford it
some value insofar as these represent a sellable equity stake
in the company.  Ideanomics counters that monetary damages are
adequate to remedy any alleged breaches and that, in any event,

N3VZZACUCNK

1    the SPA is void.

2            To justify a preliminary injunction under Federal Rule

3    of Civil Procedure 65, Acuitas must demonstrate:  (1)

4    irreparable harm absent injunctive relief; (2) either a

5    likelihood of success on the merits, or a sufficiently serious

6    question going to the merits to make them a fair ground for

7    trial, with the balance of hardships tipping decidedly in its

8    favor; and (3) that the public's interest weighs in favor of

9    granting the injunction.  For the injunction sought here --

10   that would alter, rather than maintain, the status quo --

11   Acuitas must show a "clear" or "substantial" likelihood of

12   success on the merits.  I draw upon *Metropolitan Taxicab Board*

13   *of Trade v. City of New York,* 615 F.3d 152 (2d Cir. 2010), and

14   *New York Civil Liberties Union v. New York City Transit*

15   *Authority*, 684 F.3d 286 (2d Cir. 2012), for these familiar

16   standards.

17           I will address the alleged failure to honor the

18   conversion notices first, and then address the alleged breach

19   of the lock-up provision.

20           As to the first element of the irreparable harm, the

21   Court finds that Acuitas has met its burden to establish

22   irreparable harm with respect to Ideanomics's refusal to honor

23   the Conversion Notice and Exercise Notice.  I am persuaded by

24   the papers that, if such relief is not granted, there is a

25   serious risk that monetary damages will not be available to

N3VZZACUCNK

Acuitas.  Ideanomics's most recent 10-K, filed in the docket of
this case yesterday, noted that it had "incurred significant
losses" since its inception and anticipated continued losses in
the foreseeable future.  The filing reported that Ideanomics is
not profitable and has incurred hundreds of millions of dollars
of losses in the past several years, with an operating loss of
$282.1 million in the 2022 calendar year.  Furthermore,
Ideanomics states that it lacks sufficient funding to support
its current operating model and that its sustained losses and
limited capital raise "substantial doubt about our financial
viability and as to whether we will be able to continue as a
going concern."  Indeed, Ideanomics was seeking funding from
Acuitas just a month ago and recently sought and obtained
funding from YA despite an SPA provision preventing that absent
a significantly higher stock price.  Its 10-K also noted the
possibility that its common stock may be delisted due to
notices of failure to satisfy Nasdaq's listing rules.

        Ideanomics correctly points out that monetary damages
are the typical remedy for contractual breaches.  However, as
many Courts in this Circuit have noted, "a finding of
irreparable harm may lie in connection with an action for money
damages where the claim involves an obligation owned by an
insolvent or a party on the brink of insolvency."  *See Alpha*
*Capital Anstalt v. Shiftpixy, Inc*. 432 F. Supp. 3d 326, 340-41
(S.D.N.Y. 2020) (citing cases).  Acuitas has made a sufficient

N3VZZACUCNK

showing that monetary damages are likely to be unavailable at

the end of this litigation, in light of Ideanomics's lack of

financing, the rapidly declining value of its shares, and its

risk of being delisted.  As counsel for Acuitas put the point

today, its ability to recoup something from its investment may

turn on its ability to resell the shares that it obtains via

conversion, even if that means selling at a loss.  And counsel

for Ideanomics today was not able to articulate concretely any

way in which Acuitas's economic interests would be protected

were it unable to convert.  Ideanomics did not, for example,

state that it was prepared to repay Acuitas in cash for the $20

million it paid for the conversion or that there is a

nonspeculative scenario in which it will be able to do so.

Ideanomics hopes to receive funding from its international

ventures, but that hope does nothing concretely for Acuitas.

Ideanomics has not promised, for example, to transfer that

funding to Acuitas in lieu of the shares that Ideanomics is

declining to make available to Acuitas.

        The bottom line is that Ideanomics as of now has

gotten something for something -- 20 million somethings

actually -- and is trying to keep it that way.  Acuitas's

conversion at least gives it the opportunity to salvage

something through an equity sale.  And the shares Acuitas would

receive, in the event of a bankruptcy, may also be worth

something depending on Ideanomics's assets minus liabilities

N3VZZACUCNK

1    and the existence of preferred claimants.  In any event, having

2    the shares would be more valuable than not having them but

3    having only an empty right to convert.

4         I finally note -- although this is not dispositive --

5    that the SPA, in provisions 5(b) and 14 itself characterized

6    any failure to honor the notices such as those at issue as ones

7    resulting in "irrepairable harm."  That reinforces the finding

8    of irreparable harm.

9         Turning to likelihood of success on the merits, the

10   Court finds that Acuitas is substantially likely to prevail on

11   the merits of its claim.  The terms of the SPA are clear.  And

12   both parties undisputedly agreed to the SPA.  In its papers,

13   Acuitas has made a compelling showing that, pursuant to the

14   plain language of the SPA, it was entitled to receive the

15   shares sought; and that Ideanomics breached its obligation to

16   honor the Conversion Notice and the Exercise Notice.

17        Ideanomics's counterarguments largely contend that

18   the SPA is void.  I find these stated grounds uncommonly

19   unconvincing.  Ideanomics first notes the fact that Acuitas's

20   executive and its parent company have been indicted for insider

21   trading.  Ideanomics, however, does not connect that

22   indictment, or the conduct underlying it, to the SPA, or

23   Acuitas, or this controversy, in any way.  Critically,

24   Ideanomics does not cite any part of the SPA that would deprive

25   Ideanomics of its conversion right on account of unrelated

N3VZZACUCNK

|    |    |
|----|----|
| 1  | charges being brought against an affiliated person or company. |
| 2  | Ideanomics's argument based on the insider trading allegation, |
| 3  | which really is one of guilt by association, smacks of |
| 4  | desperation to somehow avoid the SPA, which bars Ideanomics |
| 5  | from selling shares to others until May 2, a lock-up provision |
| 6  | which Ideanomics appears now to rue committing to.  And at the |
| 7  | risk of noting the obvious, an indictment is just an |
| 8  | allegation.  It does not establish the offense.  The bottom |
| 9  | line is that this excuse for what otherwise would be a blatant |
| 10 | breach of contract is a nonstarter.  Ideanomics relatedly |
| 11 | offers the theory that the $20 million that Acuitas paid for |
| 12 | the contractual conversion right might represent proceeds of |
| 13 | insider trading.  That is total speculation.  Absent |
| 14 | substantiation, this theory does not support treating the SPA |
| 15 | as void. |
| 16 | Ideanomics next accuses Acuitas of being an |
| 17 | "unregistered dealer."  That argument was not developed in any |
| 18 | way as to be convincing, factually or legally.  Acuitas in |
| 19 | major respects is clearly a dealer.  It took huge risks in |
| 20 | entering into this transaction, conduct that that important a |
| 21 | factor in determining who is a dealer as opposed to a trader or |
| 22 | an investor puts weight on it; in other words, it's an |
| 23 | important factor.  And, again, Acuitas is not a registered |
| 24 | broker-dealer and there are not other indications that make it |
| 25 | appear to be feigning as such.  All indications are that |

N3VZZACUCNK

1    Acuitas was what it says it was at all relevant times, an

2    investor.  And, again, Ideanomics does not point to any

3    provision of the SPA that disentitles Acuitas to its

4    contractual rights as an investor, even if a regretful one, to

5    the share conversion.  The SPA, by all indications, is

6    enforceable by Acuitas.

7         And those are the only arguments Ideanomics has

8    advanced in defense of what otherwise would be a

9    between-the-eyes breach.  And simply put, these arguments are

10   distractions.  They appear to be cover stories,

11   rationalizations, because Ideanomics, given its economic

12   straits, would prefer not to issue shares to Acuitas and would

13   really prefer to be free of the lock-up.  I note as well that

14   Ideanomics will have protection under the order that the Court

15   will issue in the unlikely event that it can later muster a

16   serious argument why Acuitas is not entitled to the shares.

17   Pursuant to the escrow provision in the proposed injunction and

18   the one that we'll issue, all proceeds from sales of converted

19   stocks will be held in escrow, meaning that Ideanomics would be

20   able to recover the value of these shares if it is able to

21   prove that the SPA is, in fact, void.

22        For substantially the same reasons I have covered, I

23   also find that the balance of equities tips decisively in favor

24   of granting the injunction.  Ideanomics argues that awarding

25   the relief sought here would cause a "fire sale" that depletes

N3VZZACUCNK

1    its stock value and creates reputational damages.  At the risk

2    of stating the obvious, that appears to be a situation

3    Ideanomics has already created all by itself.  That enforcing

4    Acuitas' contractual rights would subject Ideanomics to the

5    lock-up provisions of the SPA is no basis to countenance a

6    breach of those provisions.  Strikingly today, counsel for

7    Ideanomics was unable to articulate any way in which Ideanomics

8    would be hurt or claims to be hurt by enforcing the conversion

9    provision.  Its sole argument is that the agreement is illegal.

10   The balance of cognizable equities lopsidedly favors Acuitas,

11   which stands to lose its entire investment without getting the

12   shares whose conversion right was its bargained-for

13   consideration.

14        Let me finally just address the public interest.

15   Generally speaking, the public probably couldn't care less

16   about this dispute between the plaintiff and the defendant, but

17   the public always has an interest in the enforcement of the law

18   accurately, and that is what I will do today.

19        I will now turn to the separate question of the

20   lock-up provision.  Acuitas asks this Court to enforce the

21   lock-up provision of the SPA.  In the order to show cause filed

22   with the pending motion for injunctive relief, Acuitas sought

23   enforcement of the lock-up provision until after May 2nd,

24   2023, per the terms of the original SPA.  Then, in its reply

25   brief and supporting papers filed this week, Acuitas alleged

N3VZZACUCNK

1    that Ideanomics had breached by selling shares to YA pursuant

2    to the SEPA, and that Ideanomics's recent 10-K referenced these

3    sales of preferred shares under the SEPA.  In line with these

4    claims, the reply brief and proposed order granting injunctive

5    relief that was filed last night seeks relief that extends

6    48 days longer than was originally sought.  Specifically,

7    Acuitas seeks enforcement of the lock-up provision through

8    June 19th, 2023.  Acuitas also seeks an order of attachment

9    with respect to the $3,482,500 in proceeds that Ideanomics

10   allegedly received from its sale of shares to YA.

11           There is obvious force to these later requests by

12   Acuitas.  However, as a matter of fair process, these requests

13   were made later in the briefing process.  And so, Ideanomics

14   has not had an opportunity to respond in full to Acuitas's

15   allegations of the breach of the lock-up provision in

16   connection with the sale of shares to YA.  Therefore, for the

17   time being, the Court will grant only the original relief

18   sought as to timing -- that is to say, enforcement of the

19   lock-up provision through May 2nd, 2023.

20           That said, I am convinced that good reason exists to

21   require that Ideanomics hold in escrow any proceeds it has

22   received from its sale of shares to YA pending briefing on that

23   subject.  And there may well be good reason to extend the

24   lock-up by 48 days as requested.  I will, therefore, direct

25   that the proceeds from the sale of shares to YA be held in

N3VZZACUCNK

1    escrow and not dissipated while the Court hears an urgent

2    second round of briefing as to whether the lock-up provisions

3    were breached, and if so, what, if any, injunctive relief is in

4    order.

5         As will be detailed in the order to be issued

6    shortly -- and I'll read it aloud in a minute -- the Court will

7    direct that:  (1) Ideanomics shall hold in escrow, and not

8    dissipate, the proceeds of any sales to YA, on or after

9    March 7th, 2023, (2) that counsel meet and confer forthwith

10   on any outstanding relief sought in connection with the lock-up

11   provision, and (3) that the parties file any application for

12   relief in connection with that provision no later than Tuesday,

13   April 4th, 2023, at 12 p.m., and any response to such

14   applications being due Wednesday, April 5th, 2023, at 5 p.m.

15   The Court will hold a hearing on Friday, April 7th, 2023, at

16   11 a.m. to hear argument on any such applications.

17        Therein ends the bench ruling.  And what I'm going to

18   do now is I'm going to read aloud the order that I will issue

19   that grants the preliminary injunction.  And I have unsigned

20   copies which thereafter I will hand out to each side but the

21   order should hit ECF shortly.

22        Okay.  Here goes.  It's titled "Order Granting

23   Preliminary Injunction" and it bears my name:

24        On March 31, 2023, the Court held a hearing on the

25   motion of Plaintiff Acuitas Capital, LLC ("Acuitas Capital")

N3VZZACUCNK

1    for a preliminary injunction and preliminary declarative relief

2    pursuant to Federal Rule of Civil Procedure 65 and 28 § 2201

3    (the "Preliminary Injunction Motion").

4            The Court has reviewed Acuitas Capital's Complaint

5    (ECF No. 1); Acuitas Capital's Order to Show Cause (ECF No. 5);

6    Acuitas Capital's Memorandum of Law in Support of the

7    Preliminary Injunction Motion (ECF No. 6); the Declarations of

8    Terren Peizer, Michael Wachs, and Andrew B. Kratenstein, each

9    dated March 13, 0223, and the exhibits attached thereto (ECF

10   Nos. 7-9); Defendant Ideanomics Inc.'s ("Ideanomics")

11   Memorandum of Law in Opposition to the Preliminary Injunction

12   Motion (ECF No. 28); the Declarations of Larry Rong, Alfred

13   Poor, Paula Whitten-Doolin, and Barry Bordetsky, each dated

14   March 24, 2023, and the Exhibits attached thereto (ECF Nos. 20

15   to 27); Acuitas Capital's Reply Memorandum of Law in Support of

16   the Preliminary Injunction Motion (ECF No. 30); the Reply

17   Declarations of Michael Wachs and Andrew B. Kratenstein, each

18   dated March 28, 2023, and the exhibits thereto (ECF Nos. 31 to

19   32); the letter from counsel for Acuitas Capital's to the

20   Court, dated March 30, 2023, and the exhibit attached thereto

21   (ECF No. 34); Ideanomics's response to the letter, dated

22   March 31, 2023, and the exhibit attached thereto (ECF No. 40);

23   and finally the arguments presented by the parties during

24   today's hearing, the hearing held on March 31, 2023.

25           For the reasons stated on the record of the hearing,

N3VZZACUCNK

1    IT IS HEREBY ORDERED that:

2          1.  Acuitas Capital's Preliminary Injunction Motion is

3    granted;

4          2.   Ideanomics shall deliver to Acuitas Capital within

5    one (1) business day of this Order (a) 4,901,960 registered

6    common shares of Ideanomics stock pursuant to Acuitas Capital's

7    Conversion Notice, dated March 3, 2023, and (b) 7,974,481

8    registered common shares of Ideanomics stock pursuant to

9    Acuitas Capital's Exercise Notice, dated March 6, 2023;

10         3.   Ideanomics shall honor within one (1) business day

11   Acuitas Capital's future conversions of the Preferred Stock and

12   exercises of the Warrants that Acuitas Capital acquired from

13   Ideanomics pursuant to the parties' Securities Purchase

14   Agreement, dated as of November 14, 2022 (the "SPA"), and

15   pursuant to terms of the SPA.

16         There's a footnote that states that all capitalized

17   terms herein shall have the meaning ascribed to them in the

18   SPA.

19         4.   Through and including May 2, 2023, Ideanomics

20   shall not, without the prior written consent of Acuitas

21   Capital, offer, pledge, sell, contract to sell, sell any option

22   or contract to purchase, purchase any option or contract to

23   sell, grant any option, right or warrant to purchase, lend, or

24   otherwise transfer or dispose of, directly or indirectly, any

25   shares of capital stock of Ideanomics for any securities

N3VZZACUCNK

convertible into or exercisable or exchangeable for shares of capital stock of Ideanomics, provided, however, that if the trading price of Ideanomics Common Stock is at least 20% greater than the conversion price of the Preferred Stock, Ideanomics shall have the right to utilize the Standby Equity Purchase Agreement agreed between Ideanomics and YA II PN in August of 2022 to sell up to 3% of the outstanding volume of Ideanomics's common stock.

5. Ideanomics shall comply with all other terms of the SPA, including, without limitation, the SPA's requirement in Section 3(c) that Ideanomics shall have reserved from its duly authorized capital stock not less than the sum of (i) 250% of the maximum number of Conversion Shares issuable upon conversion of the Purchase Shares (without taking into account any limitations on the conversion of the Purchase Shares set forth in the Amended and Restated Articles of Incorporation), and (ii) 250% of the maximum number of Warrant Shares issuable upon exercise of the Warrants (without taking into account any limitations on the exercise of the Warrants set forth therein).

6. Pending further briefing as to the legality of such sale(s), and an ensuing court order, Ideanomics shall hold in escrow, and not dissipate, the proceeds of its sale(s) to YA, of Ideanomics common stock on or after March 7, 2023. Insofar as the parties have sought or may seek additional relief for modification of this Order, the Court directs

N3VZZACUCNK

1    counsel to meet and confer forthwith on any such matters, and

2    schedules a hearing for Friday, April 7, 2023, at 11 a.m. in

3    Courtroom 1305 of the Thurgood Marshall United States

4    Courthouse.  Any applications for relief are due Tuesday,

5    April 4, 2023, at noon.  Any responses are due Wednesday

6    April 5, 2023, at 5 p.m.

7          7.  Acuitas Capital shall not be required to post a

8    bond.  However, Acuitas Capital shall hold any proceeds from

9    its future sales of Ideanomics stock obtained pursuant to the

10   SPA in escrow *pendente lite*.

11         And it's so ordered and signed by me, dated March 31.

12         Now, just for avoidance of doubt, in the event that

13   there is any transcription error or I misspoke in any way from

14   the bench, it is the text of the written order as opposed to

15   what I said from the bench that shall control.

16         There was a request about a deadline for an answer.

17   Explain.

18         MR. BORDETSKY:  Your Honor, well, with respect to

19   that, we asked for 30 days.  I believe counsel agreed to, with

20   respect to responding, I'll allow him to --

21         THE COURT:  What?

22         MR. KRATENSTEIN:  We consent.

23         THE COURT:  Okay.  So you want 30 days?

24         What would the deadline have been?

25         MR. BORDETSKY:  I think it's next -- the 15th is --

N3VZZACUCNK

1        THE COURT:  All right.  It's late on a Friday.  You've

2   got your 30 days.  Send me a letter on Monday telling me what

3   that means.

4        MR. BORDETSKY:  Will do.

5        Two other points, your Honor.  And I apologize because

6   I was scribbling:  With respect to the April 4th submission,

7   and the April 4, 5 with respect to any disputes with regard to

8   the order, I'm sorry, I don't remember --

9        THE COURT:  Look, here's the point:  I don't know

10  who's going to be the movant here and I don't propose to

11  choreograph that.  But if one of you intends to move with

12  respect to the lock-up provision, for example, the 48-day

13  request the plaintiff appears to make and the like, the noon,

14  April 4th deadline is the deadline for an affirmative

15  application, and the 5 p.m. on April 5th is the deadline for

16  the response.  If I don't get an application from anybody,

17  there's no pending application before me --

18       MR. BORDETSKY:  And it stays on the 2nd?

19       THE COURT:  And it stays on 2nd.  Therefore, as to

20  that point, it would appear that the plaintiff would be the

21  first movant, but my imagination has its limits and there may

22  be something you're seeking.

23       MR. BORDETSKY:  Thank you, your Honor.

24       One other point I had addressed with counsel off the

25  record and asked him for his consent and he consented:  If we

N3VZZACUCNK

1    could address an issue off the record with the Court at the

2    bench, if we could approach the bench.

3        THE COURT:  Sure.  But before we do that, I want to

4    excuse our court reporter.  Is there anything further?  Is

5    there anything --

6        MR. BORDETSKY:  It may.  It may be.  This will take a

7    very short time.

8        THE COURT:  Of course.

9        Before we do that, is there anything further to raise

10   other than what you have in mind at the bench?

11       MR. BORDETSKY:  The one issue that I do have is with

12   respect to the proceeds from the YA sale to the extent that

13   whatever's remaining has to be --

14       THE COURT:  I'm not asking you to reclaim proceeds

15   from somewhere else, that may or may not be a future

16   application, but effective immediately, that stuff is frozen,

17   in effect, as I said.

18       MR. BORDETSKY:  Could we ask the courtesy of the Court

19   to email us a copy of the order so that we can send it, so that

20   could be emailed to the clients directly?

21       THE COURT:  Sure.  Happy to do that.

22       Anything further before we go to the sidebar?

23       MR. KRATENSTEIN:  One other thing, in terms of the

24   application, I know you've set the dates already.  Were you

25   contemplating that the applicants would make an order to show

N3VZZACUCNK

1    cause or just file a brief?  Do you care?

2              THE COURT:  The formalities are less important.

3              MR. KRATENSTEIN:  Okay.

4              THE COURT:  I'm going to treat your application as an

5    order to show cause.  Just be crystal clear as to what you're

6    seeking and set out with clarity an order, a proposed order, so

7    that I know specifically what the relief is.  That's why I

8    asked you to do that overnight last night, so that there would

9    be no ambiguity about concretely what was being requested.

10             MR. KRATENSTEIN:  Thank you.

11             THE COURT:  See you at the sidebar right now.

12             Go ahead.

13             MR. BORDETSKY:  I'm looking at the date.  That's Erev

14   of Passover on the 5th.

15             THE COURT:  I know.  I'm in the same boat, but, look,

16   I mean, get it to me -- if you have to get it to me at 3 p.m.

17   on the first day of Passover or at noon, you'll do that.  The

18   reality --

19             MR. BORDETSKY:  If counsel and I agree to a different

20   time, is the Court okay with that?

21             THE COURT:  Yes.  The hitch is that if you brief

22   something, I'm going to need some time to dig into it.  And,

23   so, if you want to set the dates a little bit earlier on each

24   side, that's fine.  But the problem comes if I start getting a

25   reply brief on Thursday.

N3VZZACUCNK

1        MR. BORDETSKY:  I appreciate that, your Honor.  Is

2    there any opportunity to have the briefing the following --

3    either on -- Wednesday is the second night.

4        THE COURT:  Look, if you agree to a schedule that

5    kicks off the --

6        MR. BORDETSKY:  If we add a week, is the Court okay

7    with that?

8        THE COURT:  Look, why don't you do this:  Speak among

9    yourselves, reach out to my chambers on Monday.  I'm fully

10   sensitive to what you're talking about.

11       MR. BORDETSKY:  Thank you, your Honor.

12       THE COURT:  If you ultimately want me to find a date

13   the week of April 10, although there are impediments in my

14   schedule, there will be some time.

15       This is a solvable problem and I certainly don't want

16   to impair anybody's religious observance.

17       MR. BORDETSKY:  I appreciate that.

18       (Discussion off the record)

19       (Adjourned)

20

21

22

23

24

25