1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  ACUITAS CAPITAL, LLC,

4                  Plaintiff,

5          v.                        23 CV 2124 (PAE)

6  IDEANOMICS, INC.,

7                  Defendant.         Hearing
   ------------------------------x

8                                     New York, N.Y.
                                      April 7, 2023
9                                     11:00 a.m.

10 Before:

11                 HON. PAUL A. ENGELMAYER,

12                                     District Judge

13                        APPEARANCES

14 McDERMOTT WILL & EMERY LLP
        Attorneys for Plaintiff
15 BY:  ANDREW B. KRATENSTEIN
        LISA GERSON
16      HILARY UDOW

17 BARRY M. BORDETSKY
        Attorney for Defendant

18

19

20

21

22

23

24

25

1           THE COURT:  I'm calling the case of Acuitas Capital

2    LLC v. Ideanomics, Inc., 23 CV 2124.

3           Who do I have for the plaintiff?

4           MR. KRATENSTEIN:  Good morning, your Honor.  Andrew

5    Kratenstein of McDermott Will & Emery for the plaintiff.  With

6    me are Lisa Gerson and Hilary Udow.

7           THE COURT:  Good morning to all three of you.

8           MR. KRATENSTEIN:  Mr. Wachs is also here in the back.

9           THE COURT:  Very good.

10          MR. BORDETSKY:  Good morning, your Honor.  Barry

11   Bordetsky, Law Offices of Barry Bordetsky for the defendant,

12   Ideanomics.

13          THE COURT:  Good morning to you.

14          First of all, thank you, everybody, for the thoughtful

15   and helpful submissions, and I hope as well that everyone had a

16   healthy and happy Passover holiday.

17          I am largely prepared to rule.  I have a pretty good

18   idea of how to assess the issues, thanks to what you have

19   submitted, but I do have some factual questions that I'd like

20   to begin by putting to you all.

21          To begin with, let me just ask the open-ended

22   question.  What, if any, update is there?

23          MR. KRATENSTEIN:  No update in terms of, if you are

24   getting at discussions between the parties.  There were some

25   discussions after the hearing here.  I won't get into the

1  substance of those, but there was a discussion between

2  Mr. Wachs and Mr. Bordetsky about what it might take to get

3  this resolved, but there has been no further discussion as far

4  as I know.

5      There are a few other potentially material

6  developments I do want to alert the Court to.

7      One of the issues is that the stock price is now under

8  ten cents a share.  That's relevant because, as your Honor may

9  recall, we pointed out in our opening papers that there was

10 already a delisting risk because the stock was under one dollar

11 a share.  When the stock was under ten cents a share, which it

12 is now under, that then triggers another NASDAQ rule, rule

13 58.10, which states that if the stock is under ten cents for

14 ten consecutive trading days, then that creates a reason to

15 delist, and we are a couple of days into that now, that they

16 broke that barrier a couple of days ago.

17     I raise that because -- and I know you are prepared to

18 rule, but I want to make sure that the Court is cognizant -- we

19 didn't get a chance to respond to their antidilution argument,

20 which I'd like to address because it is pertinent to this

21 issue.

22     They argue, well, you are not damaged because you have

23 antidilution -- Acuitas Capital has antidilution protection.

24 They are mixing apples and oranges there.  The antidilution

25 protection was something that was bargained for separate and

1   apart from the 90-day lockup.

2           THE COURT:  Sorry.  I am really just asking for

3   factual updates.  Let me then be more directive.

4           Did you get the shares that you were promised via the

5   order that I issued after the last hearing?

6           MR. KRATENSTEIN:  Yes.  And we issued a new notice

7   after the hearing for additional shares and that was honored as

8   well.

9           THE COURT:  That has been fully complied with.

10          MR. KRATENSTEIN:  Yes.

11          THE COURT:  Next question is, do you know how much

12  money was put in escrow from the YA transaction?

13          MR. KRATENSTEIN:  I'm glad you asked.

14          No, I don't.  I asked Ideanomics' counsel that

15  question.  The response I got was that the preliminary

16  injunction order does not require Ideanomics to disclose what

17  was put in escrow, so, therefore --

18          THE COURT:  That's crazy because that dollar amount

19  may bear on the balance of equities in terms of other

20  injunctive relief.  If it's one dollar, it's one thing.  If

21  it's a large amount of money, it's another.

22          Did you make that argument?

23          MR. KRATENSTEIN:  Yes.  We pointed out that we believe

24  we are entitled to know this information, and we are told --

25  they say they are in compliance with the order but would tell

1   me no more.

2         THE COURT:  The order did not literally require that,

3   but just common sense would.

4         MR. KRATENSTEIN:  Yes.

5         THE COURT:  Are you aware of any other violations that

6   you contend have occurred with respect to your rights or the

7   Court's order?

8         MR. KRATENSTEIN:  We pointed out one in our papers.

9   They have since modified, as they pointed out in their papers,

10  that debenture so that it is no longer convertible.  They do

11  say that they intend to issue more stock or engage in financing

12  that would result, presumably, in the issuance of more stock

13  immediately after May 2.  I guess that is not technically a

14  violation.

15        THE COURT:  It's clearly not technically a violation.

16  May 2 is a bright line.

17        MR. KRATENSTEIN:  Correct.

18        THE COURT:  Understanding that we don't know yet --

19  when I get to Mr. Bordetsky, I expect we will know, but we

20  don't know yet the amount of money that's been put in escrow.

21        Tell me about what protects your client's rights.

22  Your client's fundamental right was to be able to convert and

23  to have, as written, the period that ended May 2 free of other

24  dilutive activity unless the stock price was at a threshold

25  that permitted it.

 1              The injury to you has been caused by the dilution from

 2    the sale to YA.  How many shares did YA get pursuant to that?

 3              MR. KRATENSTEIN:  Give me a moment, your Honor.  About

 4    35 million shares.

 5              THE COURT:  How many shares does your client have?

 6              MR. KRATENSTEIN:  Now it has 42 million.

 7              THE COURT:  How many shares are there outstanding?

 8              MR. KRATENSTEIN:  They have -- let me go through the

 9    math here.  They have a total of 612 million shares left, as I

10    understand it.

11              THE COURT:  I don't know what that means, left.

12              MR. KRATENSTEIN:  Let me give you the full math.  This

13    actually comes in the context of the 250 percent reserve

14    requirement.  They have to reserve 250 percent of the shares.

15    That means for us now, given the triggering of the

16    antidilution, they have to reserve a total of 615 million

17    shares, as we calculate it.

18              THE COURT:  When you say reserved, does that mean for

19    a future issuance?  I don't understand it.

20              MR. KRATENSTEIN:  Yes.  If Acuitas Capital sends a

21    conversion and/or exercise notices, they have to have at least

22    that much stock on hand to honor them because the amount of

23    stock that they have to deliver to Acuitas Capital will vary,

24    depending on the price of the stock at that time.  The lower

25    the price, the more stock.

```
 1            THE COURT:  Right.

 2            I guess the question is, that's what you say that

 3   Ideanomics has to have in reserve in the bullpen, whatever.

 4   But my question is really, how much is outstanding?  How

 5   much -- we know that Acuitas has 42 million shares.  You know

 6   that at least at some point YA had 35 million.  There are

 7   plenty of others, no doubt, out there, including insiders.

 8            Do you have a notion as to how many shares are held

 9   other than those in reserve?

10            MR. KRATENSTEIN:  Yes.  Let me give you the full math.

11   Let me stop from the top, and I'll work downward from the

12   biggest number to the lowest.

13            According to their 10-K, they have 1.5 billion

14   authorized shares.  According to the 10-K, they had issued 787

15   million of those.  That leaves 713 million available as of the

16   end of 2022, the financial period covered by the 10-K filing.

17            Subsequently, they issued, by our count, as I

18   mentioned, 35 million shares to YA under the SEPA, 24 million

19   shares concerning that security interest provided pursuant to

20   what I'll call the McMahon note.  You will recall that note

21   that we talked about.  There was a $2 million loan by the

22   chairman of the company's father.

23            THE COURT:  Is that violative?

24            MR. KRATENSTEIN:  No.  We don't contend that that is

25   violative.  We are just adding up the shares.
```

 1          THE COURT:  We have got 35 million to YA, 24 million,

 2   I'll just call it, to McMahon.

 3          MR. KRATENSTEIN:  42 million, as I mentioned, to

 4   Acuitas.  That totals 101 million shares.  When you do the

 5   math, when you subtract 101 million from 713 million, that

 6   leaves 612 million shares available.  You asked me how did you

 7   get 612.  That's how I got it.

 8          THE COURT:  I see.  You have a concern that, actually,

 9   although it's awfully close, they have -- by your math, they

10   are short by 3 million shares what they are required to

11   reserve.

12          MR. KRATENSTEIN:  Correct.

13          THE COURT:  But adding from the bottom up, as of the

14   end of last calendar year, 787 million shares had issued, and

15   you have just identified another 101, which would bring us to

16   about 888 million shares outstanding.

17          MR. KRATENSTEIN:  Correct.

18          THE COURT:  When one asks about the dilutive effect

19   here of the one impermissible activity, the YA $35 million --

20          MR. KRATENSTEIN:  35 million shares.

21          THE COURT:  Sorry.  Forgive me.  35 million shares.

22   One moment, we are looking at about 4 percent or something --

23   it's about a 4 percent improper dilution.

24          MR. KRATENSTEIN:  That sounds about right.  Although I

25   think you would have to multiply -- I think the proper

1    denominator would be the shares outstanding at the time of the

2    issuance in March to YA.

3        THE COURT:  Be that as it may, unless one assumes that

4    the later or permissible issuances wouldn't have happened, we

5    are fundamentally at -- 35 million is the numerator and the

6    denominator is 787, plus some or all of the 42 million Acuitas,

7    24 million McMahon.  You wind up with about 4 percent.

8        MR. KRATENSTEIN:  That sounds right, your Honor.

9        THE COURT:  One way to think about the harm to your

10   client is, you have suffered an injury from a 4 percent

11   dilution.

12       MR. KRATENSTEIN:  That is one way to think about it.

13       THE COURT:  Continuing with that one way, which seems

14   mathematical, I recognize that future events may bear very much

15   on whether that 4 percent dilution is a big deal, a little deal

16   or not.  Let's just suppose that the company regained health

17   and at the end of the day you were seeking damages from the

18   fact of this unauthorized 4 percent dilution.  Just go with the

19   estimate.  How would you think about calculating?  At the end

20   of the day, later on, how would the damages analysis work on

21   that premise.

22       MR. KRATENSTEIN:  I'm glad you asked.  I don't know

23   because I am not sure how we would calculate how the stock

24   price reacted to all that and what else was going on in the

25   market at the time.  I think that's one of the reasons that we

1    have the lockup, because it's very difficult to isolate that 4

2    percent impact.

3         THE COURT:  I understand that, and I appreciate that

4    it is not as easy a math exercise to do and it also turns on

5    contingencies that we don't know.  But I am trying to fill in a

6    contingency, which is to assume a return to health and just

7    trying to think about, at the end of the day, what a model for

8    thinking about the harm would be.

9         MR. KRATENSTEIN:  You'd have to factor in a number of

10   factors.  They would include, obviously, what was the impact on

11   the stock price, how would that then affect the conversion

12   rights because, as I mentioned, how much Acuitas Capital can

13   convert is dependent on the stock price.  So all of these

14   factors need to be taken into account.

15        THE COURT:  Right.

16        MR. KRATENSTEIN:  I don't candidly know how we would

17   do that, so that's one of the reasons we are asking for an

18   extension.

19        THE COURT:  It's a reason why there is an irreparable

20   harm premise.  It doesn't speak to what the remedy should be.

21   It speaks to the reason why some equity remedy is in play.  It

22   doesn't tell you what it is, but I do find the numbers

23   illuminating.

24        I guess now let's play out the alternative

25   hypothetical, which is that the company goes under, goes

1   bankrupt.  How do you think about the harm from the dilution in

2   that scenario?

3          MR. KRATENSTEIN:  Well, then, it is difficult to

4   separate the harm from the dilution from all of the other harm.

5   We have nothing.  If the company goes under, Acuitas Capital is

6   unable to recover at all.

7          THE COURT:  And there would be a substantial argument

8   in that case of no harm, no foul.  In other words, that the

9   dilution was a breach, but if a finder of fact were to conclude

10  that the death spiral had begun and was not going to be

11  stopped, whether or not there was an unlawful dilution, on that

12  scenario the harm to you was putting your money in the Titanic,

13  not problematic dilution.

14         MR. KRATENSTEIN:  I suppose the issue would then be,

15  we are all obviously thinking about what's the but-for world.

16  It would depend on when the company went under.  If the company

17  went under after, in my scenario, June 16, which is what we are

18  asking for, Acuitas Capital would have been able, presumably,

19  to get out of its positions.

20         One of the issues that I wanted to actually get to is

21  that the flood of shares into the market, whether in part

22  because of the trigger of the antidilution, also because of the

23  additional financing that they say that they have on the line,

24  actually makes it much more likely, particularly if there is no

25  extension of the lockup, that at least Acuitas Capital, and

1  maybe others, will have to rush to sell this stock.  That

2  depresses the stock price.  That all makes delisting more

3  likely.  It's not really good for anyone.

4          THE COURT:  The rush of capital, though, one has to

5  distinguish between the unlawful expansion of shares and the

6  lawful.  I appreciate that the stock price has plunged way more

7  than 4 percent, even between our hearings, and, again, there is

8  no expert economist here.

9          But intuitively it wouldn't seem to be logical to

10  assume that what triggered that drop was predominantly the

11  approximately 4 percent dilution.  Intuitively, that would all

12  else being equal, trigger a 4 percent drop.  Obviously, there

13  are a lot of other factors in play, but I'm having a little

14  difficulty plucking out the dilution as a cause of more than

15  that.

16          MR. KRATENSTEIN:  There are multiple factors at play

17  here.  I think we need to look at the big picture.  Let's

18  recall that the two conversion notices that were sent and not

19  initially complied with until your Honor issued your order were

20  sent on March 3 and March 6.  So had those been complied with

21  at that time, Acuitas Capital would have had approximately two

22  months to sell.  Now, they get the stock in early April.  They

23  may have only one month, just on that stock.  Now, there is a

24  more of a rush if they don't have --

25          THE COURT:  I see.  That's the coherent theory of

damages, which is if you could establish to a finder of fact

down the road that the business model of Acuitas here or its

rational thinking, not with hindsight, but based on events in

real time, would have led you to sell some or all of what you

converted, had you converted earlier, then you've got an

argument that the delay in time forced you, if you sell at all,

to sell at a way lower price.

MR. KRATENSTEIN:  Yes.

And, again, the sales, obviously, there is a domino

effect.  Because when you sell and you have to sell quickly, as

opposed to selling over a period of time, that triggers a

depression of stock price.  And then you have additional --

granted it may only be 4 percent, but you have the YA now

coming in.  So you have all of this and then you have the

additional delisting risk.  And if there is a delist, now the

stock goes to the over-the-counter market, which makes it

harder to trade and further causes problems.

THE COURT:  Has Acuitas sold or tried to sell any of

the stock it has?

MR. KRATENSTEIN:  I don't know the answer to that

question.  I can ask Mr. Wachs, if your Honor is willing to let

me, but I don't know if it has.

THE COURT:  Do you know whether there had been a

concrete plan by Acuitas at the time it tried to convert, but

proved unsuccessful, to promptly sell?

1          MR. KRATENSTEIN:  Acuitas' plan is actually, to some

2     extent, demonstrated by the lockup itself.  So the lockup is

3     for 90 days.  Acuitas Capital's plan was to exercise its

4     conversions and use that 90-day period, unless something

5     unforeseen happened that made them change their plan, to exit

6     the positions within 90 days.

7          THE COURT:  Is that something that you have seen some

8     documentary corroboration of?  I know your clients have told

9     you that, and I'm not discrediting it.  But thinking ahead to

10    what a damages trial might look like and a finder of fact

11    saying, easy to say that now but is there something you can

12    point to in real time, do you know if there is evidence that

13    corroborates that that had been the intention?

14         MR. KRATENSTEIN:  My understanding is that they have

15    basically a formula that they use, which is, this is how we

16    want to sell the stock and we want to do it over time.  They

17    have told me about the formula.  I can't say I've seen it on

18    paper.  I am sure it does exist.  That was the plan.  They

19    specifically bargained for that 90 days, and this goes back to

20    the lockup, because that is their plan.

21         THE COURT:  Understood.

22         Assuming that Acuitas had been able to convert when

23    they tried to do so and allowing for whatever reasonable time

24    it would take pursuant to what you say was an internal client

25    plan to dispose of the shares, has there been any

1    seat-of-the-pants math done as to what the sales of those

2    shares would have netted Acuitas?

3              MR. KRATENSTEIN:  The short answer to your question

4    is, I have not done that math, so I do not know the answer.

5              THE COURT:  That sounds like, in a way, the most

6    accurate shorthand in terms of thinking about a damages formula

7    here.  Your point is well taken that it's somewhat -- it's not

8    just the 4 percent "dilution."  It's the loss of the time

9    opportunity if it could be established to a finder of fact that

10   you in fact would have sold it in March or something.

11             MR. KRATENSTEIN:  Right.

12             THE COURT:  It appears to me that somewhere in that

13   space is the most useful device for thinking about concretely

14   how to monetize the harm to your client.

15             MR. KRATENSTEIN:  Assuming, and of course your Honor

16   started this with a very important and big assumption, that

17   they are able to recover, which is still a tremendous risk that

18   they won't be able to.

19             THE COURT:  Let's turn to that then.

20             To be very direct with you, I'm skeptical extending

21   the period of 90 days.  It looks to me as if what you need,

22   your client needs is cold hard cash.  You need money preserved

23   for your benefit.  But it's unclear to me why extending the

24   lockup by 48 days does you much good beyond giving you a lot of

25   leverage with Ideanomics.  Explain to me how that does you

1    good, as opposed to some alternative relief that hasn't been

2    proposed which would involve escrowing money for your benefit.

3         MR. KRATENSTEIN:  Acuitas Capital cares more about the

4    value of the stock.  Ideanomics cares less about the value of

5    the stock.  It's just trying to survive, as far as we can tell.

6         It is, thus, to their incentive, Ideanomics'

7    incentive, to get financing however it can, whenever it can,

8    and whatever happens to the stock price happens to the stock

9    price.  That all hurts Acuitas Capital.

10        What's going to happen, if the lockup is not extended,

11   presumably, is as follows.  Acuitas Capital will convert the

12   remainder of its convertible securities.  That will then wind

13   up being tens of millions of more shares coming to Acuitas --

14        THE COURT:  I thought you said they are limited to

15   6 -- they have to keep 615 in reserve, right?

16        MR. KRATENSTEIN:  615 have to be kept in reserve.

17        THE COURT:  Until when, May 2?

18        MR. KRATENSTEIN:  Right.  Until we are done

19   exercising.

20        THE COURT:  So your worry is that on May 3, in order

21   to get cash, they sell the other 612 or 615 million shares,

22   something like that.

23        MR. KRATENSTEIN:  That's one thing that could happen.

24   There won't be enough.  Right now there is already a shortfall,

25   apparently, of the registered shares, even today, so that's a

1    problem.

2         Beyond that, if you just look at what's going to

3    happen in the market, what will likely happen is, all of the

4    stock will be sent at some point to Acuitas Capital.  Acuitas

5    Capital will then be under tremendous pressure to sell before

6    May 2.  When the date is kept at May 2, Ideanomics would be

7    able to get new financing in return for issuing more stock, so

8    there will be more dilution as of that date.  So there is

9    incentive for Acuitas Capital to sell between now and May 2.

10   If that happens, the stock probably goes to a penny, arguably,

11   because so much stock is going to get pumped into the market,

12   and at some point there are not going to be enough people

13   potentially to buy the stock.

14        THE COURT:  That also has a pessimistic assumption.

15   In other words, if Ideanomics is trying to get capital because

16   it thinks it still has a decent business model and it just

17   needs money to survive, the premise there is they have got a

18   productive plan for that money.

19        MR. KRATENSTEIN:  I suppose, but we have not seen it.

20   We don't know what their plans are.

21        All we know is that Acuitas Capital, if May 2 stands,

22   will likely have no choice but to just sell quickly, within now

23   less than a month, and that is going to depress the stock

24   price.  That will, unless something unforeseen happens, result

25   in delisting at some point, maybe even within ten days, and now

1  they are off running to the over-the-counter market to try the

2  sell the stock.

3          THE COURT:  How much money did Acuitas ultimately give

4  in total to Ideanomics for its conversion rights?

5          MR. KRATENSTEIN:  $20 million was the investment.

6          THE COURT:  If you sold the stock that you have today

7  at the current market price, how much would you get?

8          MR. KRATENSTEIN:  I don't even know if they would

9  recover that much.  I think they would be taking a loss.

10          THE COURT:  I know they have taken a loss.  You've got

11  35 million shares.

12          MR. KRATENSTEIN:  They have 42 million.

13          THE COURT:  42 million shares.

14          MR. KRATENSTEIN:  It is at ten cents a share now.

15          THE COURT:  At ten cents a share times 42 million

16  shares is about 4.2 million.

17          Assuming that the market wasn't moved, assuming that

18  all other factors stay equal, which is improbable, given the

19  dynamic nature of events, and assuming that you had a trader

20  who was able to bleed the sales out into the market in an

21  orderly way that didn't trigger a panic, you would be able to

22  get $4.2 million and so forth.

23          MR. KRATENSTEIN:  With this much stock, I think the

24  answer to that is no, because it's --

25          THE COURT:  That's hard to disentangle from the fact

```
 1   that other factors are driving the stock down.

 2            MR. KRATENSTEIN:  Yes.  You're talking about tens of

 3   millions of shares, so this will be a major factor.

 4            THE COURT:  Let me turn to you, Mr. Bordetsky.

 5            Just factually, how much money was put in escrow?

 6            MR. BORDETSKY:  $313,000, your Honor.  And if I may --

 7            THE COURT:  Just explain how that all happened.  What

 8   became of the rest of it?  How much did YA pay?

 9            MR. BORDETSKY:  We have 313,000.

10            THE COURT:  How much did YA pay to your client?  They

11   bought 35 million shares, right?

12            MR. BORDETSKY:  The proceeds from that were 313,000,

13   your Honor.

14            THE COURT:  In other words, your client might have

15   spent some of that before I froze it.

16            MR. BORDETSKY:  Two separate transactions.  Let me be

17   clear.  Two separate transactions.

18            There was a transaction that, for lack of a better

19   phrase, may have triggered plaintiff coming into court, and

20   then prior to the order there was a second transaction.  The

21   first transaction, the funds were spent.  There are no funds

22   remaining from that initial.

23            THE COURT:  I'm sorry.  Just to be clear, there is the

24   transaction that I have found, the one in SEPA that was at some

25   point in March.
```

1          MR. BORDETSKY:  Yes.

2          THE COURT:  How much did that --

3          MR. BORDETSKY:  I don't have the number, your Honor.

4  I apologize.  I can get that in short time, your Honor, for the

5  dollar amount, but the funds were utilized for the ongoing

6  purposes of the company, such as filing the 10-K, ensuring that

7  the business is moving.  It was all utilized.  It was all

8  utilized.

9          THE COURT:  Before you got into court.

10          MR. BORDETSKY:  Well before.

11          When the second tranche came in, the order came, the

12  order was sent in accordance with my obligation to this Court,

13  directly to the client, to which the funds hadn't been received

14  from YA at the time.  When the funds were received from YA, we

15  have -- the funds weren't received directly from YA because an

16  escrow account had to be set up to ensure that we were in

17  compliance.

18          THE COURT:  The $313,000, though, itself, derives from

19  the more recent issuance.

20          MR. BORDETSKY:  Yes, your Honor.

21          THE COURT:  Which you contend is no violation of your

22  agreement with the plaintiff.

23          MR. BORDETSKY:  That's correct.

24          THE COURT:  That's 313,000.

25          MR. BORDETSKY:  That's 313,000.

1            To counsel's point, counsel raised that he asked us

2    for the dollar amount.  That wasn't what was asked.  What was

3    asked was proof of compliance with the -- and I hope the Court

4    wasn't offended because I wanted to pull up the correspondence,

5    which was, provide proof that Ideanomics complied with the

6    order.  And our response was, Ideanomics has complied with the

7    order.  We don't have an obligation.

8            Just as, your Honor, with respect to when we provided

9    the shares and the funds are going to be held *pendente lite*, we

10   don't have anything identifying what was there.  We have a

11   presumption that we are both parties before this Court.  We are

12   both learned counsel, understanding the repercussions if we

13   don't comply with this Court's order for the clients.

14           I just want --

15           THE COURT:  I got that.

16           MR. BORDETSKY:  I needed that clarity.

17           THE COURT:  Clarity gotten.

18           Let me just ask you, can you ballpark, just from what

19   you know, the approximate revenue from the first sale to YA?

20           MR. BORDETSKY:  With the Court's permission, I can

21   get -- I don't have my prior set of papers.  I can find out

22   that number within --

23           THE COURT:  Mr. Kratenstein was rising.

24           No commentary, but do you have the number?

25           MR. KRATENSTEIN:  Yes, your Honor.  $3,482,500,

1   according to the 8-K they filed.

2          THE COURT:  Mr. Bordetsky, any reason to doubt that?

3          MR. BORDETSKY:  No.  Particularly since, one, it is

4   Mr. Kratenstein, and I don't think he would misrepresent, and,

5   two, it's from the 8-K.

6          THE COURT:  In effect, from the second installment,

7   which is of a potentially different legal character, you were

8   able to set aside the 313,000 in proceeds, which is something

9   like 8 percent or so of the proceeds from the violative

10  transaction.

11         MR. BORDETSKY:  Different.

12         THE COURT:  I understand it's a different pot of

13  money, but my intention had been, I had hoped that some of the

14  proceeds from the first YA transaction were still around.  They

15  weren't.  It is what it is.

16         That is some rough proxy, crude to be sure, of what

17  may turn out to be the damages theory for the plaintiff.  In

18  effect, from the second installment, the money you've been able

19  to put aside equates to a little under 10 percent of that

20  amount.

21         MR. BORDETSKY:  Yes.  Utilizing that basis, yes.

22         THE COURT:  Let me just ask you -- I realize we are in

23  early days yet.  But take as a given the finding to this point

24  of an apparent violation by Ideanomics with respect to that

25  first transaction with YA, the one that yielded the $3.4

1    million.

2           How would you think the right analysis would be of

3    what the injury is to Acuitas?  The reason I am going there is,

4    I am trying to fast forward ahead to think about Acuitas'

5    interests and, to the extent an equitable remedy is in order

6    here, what is proportionate to it.

7           Without arguing other points for now, just walk me

8    through -- you are me.  You have got to figure out what the

9    rational mode is of thinking about the damage to Acuitas.

10          How do you process that.

11          MR. BORDETSKY:  Of course, reserving our position with

12   respect to the validity of the argument.

13          THE COURT:  Got it.

14          MR. BORDETSKY:  That being said, your Honor, you asked

15   my colleague, what damages analysis would be associated with

16   the allegation of dilution.

17          THE COURT:  And as later developed -- I started with

18   dilution.  But then as the conversation went on, Mr.

19   Kratenstein made a separate and seemingly colorable point,

20   which is that it's not merely the dilution.  It's the delay in

21   getting in hand the shares.

22          MR. BORDETSKY:  A couple of things.  The law is clear

23   that.  You asked the Court, what could be the damages

24   associated with the first two?  And the answer is, 1.6 million.

25   We have the specific number in our moving opposition papers,

1    your Honor, where what the Court is to do is to look to see the

2    date of the breach, the value of the stock.  We are done.

3    That's it.  It's 1.6 million, two different tranches.  One was

4    for approximately 1 million.  One was for approximately

5    600,000.

6            THE COURT:  It date of the breach were the dates on

7    which a conversion was sought and not obtained, right?

8            MR. BORDETSKY:  It was a date -- the law says the date

9    of the breach is the date that the obligation to provide, so

10   not the date of the notice of conversion, but the next day.

11           THE COURT:  There are two aspects of problematic

12   behavior by Ideanomics.  One of them is providing the stock

13   later in time, not until I had ordered that it be provided.

14   About a month passes in between, or a little less than that,

15   three weeks.  That's one thing and that seems to be, in some

16   ways, the clearest way of thinking about damages.

17           But there is a separate violation, which is the

18   dilution.

19           MR. BORDETSKY:  Sure.

20           THE COURT:  Focusing on the first and putting aside

21   the dilution, explain to me your theory on how you measure the

22   damages from the delay in the conversion.

23           MR. BORDETSKY:  I think we cited the authority in our

24   opposition brief, your Honor.

25           The analysis is simple.  It's the date that the

obligation was due, so each date that -- I believe it was the

3rd and the 6th, which would mean the 4th and the 7th, your

Honor.  I don't have a calendar, so forgive me.

The value of the stock at the time, I think it was at

13 cents, your Honor, whatever it was, and it's a multiplier.

That's it.  That's the simplicity of the damages and that's

what we have put to the Court is, with respect to just those

two aspects, they asked for shares.  They didn't get the

shares.  What's their value?  What is the dollar amount?

THE COURT:  Help me with this.  As I understand it,

the conversion was not an affixed dollar amount.  Is it the

case that when Acuitas converts later on, they actually get

more shares than they would have gotten on the 4th through the

7th, or did they get the same number of shares?

MR. BORDETSKY:  I'm sorry.  I'm not following --

THE COURT:  Let me ask Mr. Kratenstein.

Mr. Kratenstein, just mathematically, did the

conversion right entitle your client to a fixed number of

shares, or was it to convert to get the number of shares that

would be generated by dividing the money you contributed by the

current stock price?

MR. KRATENSTEIN:  There are two different instruments.

The answer is different for the two of them.

For the preferred stock, there is a conversion price

that is just over -- was just over 20 cents a share, and so

1     that gets you a certain amount of stock.

2          The warrants are different.  The warrants are,

3     basically, you can think of them as a price-list warrant in a

4     sense that it doesn't have a price on the warrant.  There is

5     the conversion formula, this Black Scholes model, which the

6     inputs include the stock price at the time that the stock --

7     the exercise known as ascend.

8          THE COURT:  Got it.

9          Mr. Bordetsky, given that, sounds like there is a

10    different analysis for the two tranches.

11         MR. BORDETSKY:  There would be an analysis, but it's a

12    mathematical analysis.  That's the ease of the damages

13    calculation, to the extent there was a finding as to, OK, had

14    they converted, had these shares been provided -- because at

15    the end of the day, they are asking for shares.  The bottom

16    line is, they are asking for shares.  So if they are asking for

17    common shares, it's the price point of the shares.

18         THE COURT:  Right.  If it simply had been, you get a

19    million dollars worth of shares at the current price, you would

20    have available the argument that whatever day you got the

21    shares, you got a million dollars worth and the fact that they

22    were trading at a lower price meant you got more shares.

23         Mr. Kratenstein basically rejoins by saying it's a

24    little more complicated than that.  You are not actually

25    getting the same value on a later date because it isn't quite

1    that simple.

2          MR. BORDETSKY:  I disagree with my friend.  I disagree

3    that the law is clear that the breach -- that the value of the

4    shares on the date of the breach is the damages.

5          Now, there would be an offset if -- one point that the

6    Court asked with respect to plaintiff of what has been sold we

7    identified in our moving papers.  In each instance that they

8    received shares, approximately 24 million, there was, lo and

9    behold, right around the same amount of number of shares that

10   were sold in the market that depressed the price of the stock.

11   That being said, your Honor, we take -- there would be if

12   anything, an offset.

13         So, hypothetically, there are the two transactions.

14   We have a dollar, $1.6 million that we calculated just based on

15   of the value of the common shares at the time.  If they sold it

16   for 600,000, it's easy math.  If they later received these

17   shares, which they received in compliance with the Court's

18   order and sold them at a price less than they would have

19   received had the conversions been honored, we have got the

20   difference.  It's easy math.

21         THE COURT:  Have you done a seat-of-the-pants estimate

22   of what that number is likely to be?

23         MR. BORDETSKY:  Our issue is, we can't tell the Court

24   what they have definitively sold because there hasn't been an

25   order to that effect that they have to provide.  That would be

1  discovery associated with that.  We would learn what they sold,

2  when they sold it --

3       THE COURT:  My understanding is, at this point, it

4  does not appear that anything has been sold.  Maybe that's true

5  or not.  Just operate on the assumption that they are sitting

6  on this diminishing asset.

7       MR. BORDETSKY:  Sure.

8       The quick answer is, if they never sold it, it went to

9  zero, right, because that's their worst-case scenario, if you

10  will.  $1.6 million as it relates -- I'm utilizing the two

11  transactions that weren't honored that were later honored.  1.6

12  million.  The law is clear on that, your Honor.

13       As regards to whether they sold it, they sold.  They

14  have sold.  We don't -- it would be super easy for this Court

15  to have information from the plaintiff as to the amount.  The

16  securities world is the most regulated world.  So they can

17  provide, at a moment's notice, tongue and cheek, but they can

18  provide when the shares were sold, for what price, and what

19  amount they received them like that.

20       THE COURT:  Let me turn to a different subject.

21       Right now, between now and May 2 or May 3, how is your

22  client getting money to survive?

23       MR. BORDETSKY:  Well, the quick answer is, it depends

24  on what this Court is doing, because we have lined up and we

25  indicated through --

1          THE COURT:  Between now and May 2.

2          MR. BORDETSKY:  Yes.  We have indicated, through

3    Mr. Poor's declaration, that we have lined up people to provide

4    us with nonequity funding.  But if an order comes down

5    saying --

6          THE COURT:  Put aside the order.  Let's assume right

7    now that you can do what you believe you can do.

8          MR. BORDETSKY:  They're raising money.

9          THE COURT:  You're raising money through nonequity

10   issuing mechanisms.

11         MR. BORDETSKY:  Yes.  I'm being -- what I don't want

12   to do is provide nonpublic information here.  I'm walking

13   carefully.

14         THE COURT:  Let me see --

15         MR. BORDETSKY:  We indicated in the papers they are --

16   I'm choosing my words carefully.  They are actively, have been

17   lining up active funding associated with raising funds for

18   ongoing business.  Again, there is 670 employees.  It doesn't

19   benefit anyone for this company to go under.

20         THE COURT:  After May 2, assuming that there is no

21   extension, what would the company's plan be?

22         MR. BORDETSKY:  It would provide them with an

23   alternative means of raising funds.

24         I don't have a definitive answer for the Court because

25   we put a stop on everything to ensure that we weren't going to

1   be doing anything that this Court could see as a bad-faith

2   move.

3           The quick answer is, there is a practical reality that

4   in the past that they have provided shares, a convertible

5   debenture, if you will, to think that that would happen in the

6   future would be a logical followthrough with that argument, but

7   I can't tell you definitively.

8           THE COURT:  Put yourself in Mr. Kratenstein's client's

9   shoes.  You don't want the period of time, the May 2, to be

10  extended.  I understand that.  I understand there are practical

11  reasons from your perspective.

12          But assuming that the Court felt that some form of

13  equitable relief, something, including setting aside more

14  money, something was in order here.  But, from your point of

15  view, the extension from May 2 to mid June does more harm than

16  good, balance of the equities.

17          Can you give me a productive proposal, something that

18  assists the plaintiff, as opposed to a bunch of nos?

19          MR. BORDETSKY:  The Court is asking me to provide a

20  relief for the benefit of the plaintiff other than what was

21  requested in the papers --

22          THE COURT:  The Court is asking you to help the Court

23  work through the balance of the -- wait a minute.

24          MR. BORDETSKY:  I'm sorry.  It's a bad habit, your

25  Honor.

1          THE COURT:  It's a terrible habit.  And it's a

2     terrible habit because it keeps happening between you and me,

3     with my having warned you.  Please don't.  It's not personal.

4     It is for the court reporter.

5          I'm asking you, because this squarely implicates the

6     balance of the equities.  You know that I found a violation.

7     It's really twofold.  It's the failure to convert on time and

8     then it's the initial YA transaction.  You know that I have

9     found irreparable harm.  Those weren't changing.

10          But the balance of the equities is the issue here,

11     which includes not just thinking about the particular request

12     at hand, but an alternative world.  And it's a lot easier to

13     see things your way if there is some other mechanism that can

14     provide meaningful relief to the plaintiff.

15          You can say, I don't want to hell him, but you can

16     also see that providing a constructive alternative route helps

17     your client.

18          MR. BORDETSKY:  Sure.  I think that the request for

19     the extension is, as we indicated in the papers --

20          THE COURT:  I know, but you are not answering my

21     question.

22          I asked you, give me an alternative to the request for

23     an extension, and you come out of the box to attack the request

24     for the extension.  That's not answering the Court's question.

25          MR. BORDETSKY:  The alternative -- the funds have been

1  held in escrow in terms of the -- in terms of the allowance

2  with respect to an equitable remedy that would give the

3  plaintiff what it believes is some relief to get a benefit of

4  the lockup.

5          I don't know what -- the quick answer, your Honor, is,

6  I can't think of one that would be that would be compliant with

7  both the -- there is the original lockup, so they are asking

8  for the extension.  The funds have been put in escrow, so those

9  aren't being touched at this time.

10         In terms of the issuance of the shares, whether it be

11 additional shares, I can't speak --

12         THE COURT:  Suppose the plaintiff had come here to

13 propose some form of arrangement where, as more money comes in,

14 some portion of it gets set aside for the plaintiff, added to

15 the $313,000 pot.

16         Any problem with that?

17         MR. BORDETSKY:  I think that the -- acknowledging the

18 Court's equitable powers, I think that there is a need for the

19 company to be able to utilize funds.  To what extent in terms

20 of a percentage --

21         THE COURT:  I'm asking you conceptually, not haggling

22 over price.

23         MR. BORDETSKY:  In the ordinary course, this would

24 certainly be something that I would speak to my client with

25 respect to the process.  I hope the Court can appreciate that.

1          THE COURT:  Does your client or your client's

2     executive staff have other things of value that could be

3     secured so as to protect the plaintiff?  I appreciate your

4     client doesn't want to interfere with the mechanics of an

5     ongoing business, but your client has also stuck the shiv into

6     somebody who they had an agreement with, and that can't be

7     ignored either.  I am trying to think through the right

8     equitable solution that doesn't, any more than necessary, get

9     in the way of your client's bid for survival but also doesn't

10    disrespect the victim.

11         MR. BORDETSKY:  We indicated in our initial opposition

12    the funds that we expect to come in from China.

13         THE COURT:  How is that coming in?  How is China --

14         MR. BORDETSKY:  Approximately 7 million.  So my

15    understanding, with the machinations of having business in

16    China, is that when you do business in China, the money -- it's

17    all it can do, is cycle through until the business is over

18    with.  So we are closing that aspect of it and the funds, we

19    believe, in May should be coming over, and we submitted a

20    declaration to that point, your Honor, with respect to the

21    dollar amount.

22         THE COURT:  In other words, you've got some real cash

23    coming in in May, not in April.

24         MR. BORDETSKY:  Again, it's the People's Republic of

25    China, so we believe that we have funds coming in.  We are

1    working through the process.  But it was important enough for

2    us to inform the Court of this, that these are assets and there

3    are other raises contemplated.

4              THE COURT:  Let me turn back to you, Mr. Kratenstein.

5              The nature of this proceeding, which is that it came

6    in all of a sudden, and we have been dealing with submissions

7    from each side, but nothing that looks like adversarial

8    discovery, means in part that you are left to guess about

9    things financially.

10             Is there financial information from the defense that

11   would be of use to you in an ongoing application for modified

12   preliminary belief?  Without boiling the ocean, what's the

13   critical data that would be of use to you?

14             MR. KRATENSTEIN:  If your Honor were so inclined to

15   order such information, I think it would be the type of

16   information, their financing plans, whatever letters of intent

17   or other agreements, formal or informal, they have for future

18   financing, any funds that are coming in when they are projected

19   to come in, when they actually come in, that type of

20   information.

21             THE COURT:  Let me ask you this question.

22             If you got that sort of information, which might well

23   be valuable for a dialogue in a subsequent proceeding between

24   me and counsel, it also, for exactly the reason that

25   Mr. Bordetsky spotted, sounds like inside information as

1     relevant to any trader.

2          It sounds to me as if, if your client got that

3     information, your client might be precluded from buying or

4     selling.  That's a challenge because it is in fact exactly the

5     sort of information that has the potential to be useful to me

6     in a hearing like that.  There might or might not be a way of

7     doing this on a counsel's-eyes-only basis, but I am trying to

8     work productively with counsel to help me solve the problem,

9     but I also don't want to create a problem that, in the search

10    of a solution, create a bigger problem.

11          Thoughts on that?

12          MR. KRATENSTEIN:  I'm glad you brought it up because I

13    completely agree with you.  It would be very difficult for me,

14    even on a counsel's-eyes-only basis, to assess that type of

15    information.  I really rely on my clients to tell me what that

16    means for them.

17          That's one of the reasons why, your Honor -- and I

18    know you came in perhaps disinclined to extend the injunction,

19    but in some ways it's the simplest and least disruptive thing

20    to do on the equities.

21          THE COURT:  Going back to where I am going with you,

22    is there a way, if I wasn't inclined to extend the period and

23    if it was a bad idea to start prying loose inside financial

24    information in an injunctive litigation, with all the problems

25    for a lot of people that that could have, is there a formula, a

1   system, a structure that results in increasing the money set

2   aside for your client while not scaring away the fishes,

3   scaring away the lenders?

4          MR. KRATENSTEIN:  My short answer to that question is,

5   of course, if your Honor was not inclined to extend the

6   injunction, it would be better to have more money put away,

7   escrowed in the event that we have to litigate over damages.

8   So, yes, it would be better, particularly since they have only

9   escrowed, as you pointed out, 8 percent of the $3.482 million.

10  It would better if more money was put away.  That's for a

11  number of reasons.

12         My concern is the same concern we came to court with,

13  which is, this money is starving -- this company is starving

14  for cash.  We are concerned that, even if it's for our benefit,

15  cash is put aside for our benefit, but we don't have really the

16  currency that they intended -- that the parties agreed to give,

17  which was stock and the lockup period in which to sell the

18  stock, that is, in some ways -- and I'm sorry to repeat

19  myself -- the least disruptive, we think, based on what we have

20  read publicly, the 10-K, just their SEC filings, to them, and

21  they could issue convertible -- if they want to issue debt,

22  issue debt.

23         THE COURT:  I don't know what the alternatives are

24  available to them.  But Mr. Bordetsky has proffered to us that,

25  at a conceptual level, after May 2, the game plan involves

1    raising money by, in part, the issuance of stock, which stands

2    to reason.

3         The issue with your extension is that it appears to

4    create a substantial risk that that remedy, in some

5    short-sighted way, might be beneficial to your client for

6    leverage, but it may destroy the company.  From a balance of

7    equities perspective, that's hard to swallow.

8         MR. KRATENSTEIN:  Understand --

9         THE COURT:  Your best interests here are almost

10   certainly aligned with Ideanomics' survival.

11        MR. KRATENSTEIN:  Certainly.  We want Ideanomics to

12   survive.  I appreciate and understand your point.

13        According to Mr. Poor's declaration, they have

14   negotiated with various third-parties financing through

15   convertible notes, so I take it that is convertible into stock,

16   that would begin soon after.  We don't know exactly when, May

17   2, 2023, and then he says they will lose the financing.

18        First of all, I do want to note that other than that

19   statement, they have provided no evidence of that.  They are

20   just saying they will lose the financing.  It's somewhat

21   conclusory, to say the least.

22        They do have -- I only know -- we only know what we

23   read in the public filings.  They presumably could issue debt.

24   They presumably could do other things that would not violate

25   the lockup if it went on for another 48 days longer than May 2.

1          The best way to make Acuitas Capital whole or close to

2     whole, given the financial situation of this company, is to let

3     the company use its cash to operate.  Remember, they also have

4     that VIA acquisition they made that triples the amount of cash

5     they need to use every month.  Some money should be put aside

6     to be sure.

7          But if it's between putting a lot of money aside and

8     not extending the lockup, it's better to extend the lockup

9     because then, at least, Acuitas Capital has the ability to use

10    the currency that it has available to it that the company can

11    make available to it, assuming the reserve requirement isn't

12    breached.  But assuming the company can make that stock

13    available, that is the best way for them to get even close to

14    what they bargained for.  Otherwise, we are concerned there is

15    actually increased risk that the company won't have the funds

16    it needs to operate, and then that triggers the worst-case

17    scenario for everybody.

18          THE COURT:  One moment.

19          Counsel, if there is any factual information, not

20    argument, I don't have that I should have, I'm happy to hear

21    from you.  But, otherwise, my intention is to take a brief

22    recess.

23          MR. KRATENSTEIN:  May I have a moment to just consult

24    with my client?

25          THE COURT:  Yes.

1          Mr. Kratenstein, factual.  What is it?

2          MR. KRATENSTEIN:  I did want to update the Court.  You

3     had asked if there had been any sales of the most recently

4     received stock.  There were sales in the amount of $420,000

5     worth.  They have not settled yet, so we have not escrowed.

6     When they do, we will escrow that amount.

7          The only other thing I note --

8          THE COURT:  If I may, $420,000 worth sounds like

9     something like 4 million shares.

10         MR. KRATENSTEIN:  Yes.

11         The only other thing I would note is, and this goes

12    back to the point I made about the 90 days and the importance

13    of it, there is a pattern here.  We talked a lot about the

14    March 3 and 6 conversions.  That was predated by the late

15    February conversations, which they honored, the late February.

16    So the way Acuitas Capital does this is, it basically spaces it

17    out so that it's done every two weeks and sells volume,

18    essentially, in 15 percent chunks.

19         THE COURT:  In other words, later on in a damages

20    proceeding there is a business practice that you would turn to

21    to project the would-have-been world.

22         MR. KRATENSTEIN:  There is a business practice.

23         I think the difficulty, your Honor, getting back to

24    the irreparable harm, is figuring out what the monetary impact

25    is of all of this, including with a company that doesn't have

1    cash, but we have covered that ground, so I won't repeat it.

2         THE COURT:  Counsel, I'll be back in a half hour with

3    a bench ruling.  Thank you.

4         (Recess)

5         THE COURT:  Counsel, I apologize for the delay.  It

6    took a little longer than expected.  I have a bench ruling, and

7    I'll ask my law clerk to give a copy to the court reporter.

8         I am now going to issue a brief bench ruling on

9    plaintiff Acuitas Capital LLC's motion to modify the

10   preliminary injunction granted on March 31, 2023.

11        As with the ruling last week, there will not be a

12   written decision, and I will instead issue a bottom-line order

13   reflecting the Court's resolution of the motion.  To the extent

14   the Court's reasoning is significant to counsel, you will need

15   to order this transcript.

16        Acuitas moves for two modifications to the order

17   granting injunctive relief.

18        First, Acuitas proposes a modification to paragraph 4

19   of the order.  That paragraph, broadly speaking, prohibits

20   Ideanomics from offering, selling, or otherwise transferring,

21   indirectly or directly, any shares or securities convertible or

22   exercisable for shares of capital stock of Ideanomics through

23   May 2, 2023.  Acuitas proposes that this "lock-up" period be

24   extended through June 19, 2023.  Acuitas also proposes that the

25   order specify that it includes transactions under the standby

1  equity purchase agreement, or the SEPA, the amended secured

2  debenture purchase agreement, the "amended SDPA," and the

3  secured convertible debenture between Ideanomics and YA II PN

4  or "YA."

5          Second, Acuitas proposes a modification to paragraph 6

6  of the order.  That paragraph requires that, pending further

7  briefing as to the legality of such sales, Ideanomics hold in

8  escrow the proceeds of its sales to YA of Ideanomics' common

9  stock on or after March 7, 2023.  Acuitas proposes that the

10  Court require Ideanomics to hold in escrow the proceeds of any

11  sales or transactions involving Ideanomics capital stock

12  entered into on or after February 1, 2023, including, but not

13  limited to, funds received from YA pursuant to the SEPA, the

14  amended SDPA, and convertible debenture.

15          I have reviewed in detail the parties' memoranda of

16  law, supporting declarations, and the materials attached to

17  those declarations.  Again, I want to praise the quality and

18  thoughtfulness of those submissions.  I appreciate that counsel

19  had a tight turnaround time and that some counsel were further

20  constrained by the Passover holiday.  I also want to thank

21  counsel for helpful and informative colloquy today.

22          I incorporate by reference the account of the facts,

23  the governing legal standards, and the reasoning for the

24  preliminary injunction articulated in last week's bench ruling.

25          Paragraph 6.

1          I turn first to the proposed modification of paragraph

2     6, to require Ideanomics to hold in escrow all proceeds of

3     transactions of its capital stock entered into on or after

4     February 1, 2023, including funds received pursuant to the

5     SEPA, the SDPA, and the convertible debenture.  This

6     modification is granted in part and denied in part.

7          The Court grants two aspects of the modification.

8          First, as to the start date for the transactions

9     covered by paragraph 6, I find that requiring Ideanomics to

10    hold in escrow funds received from transactions on or after

11    February 1, 2023 is proper.  That is so, given that the SPA, in

12    section 4(j), states that the lockup period begins on the later

13    of the execution date or the date of the last registration

14    statement, which was declared effective February 1, 2023.  As

15    to the end date, however, the Court will make clear in the

16    modified order that Ideanomics is to hold in escrow only

17    proceeds received up to May 2, 2023.  I will explain why

18    shortly, in explaining my assessment of the proposed

19    modification to paragraph 4.

20         Second, as to the scope of the escrow provision, I

21    find it proper to modify the order to specify funds received

22    from YA pursuant to the SEPA.  That is because Acuitas has made

23    a persuasive showing that transactions under the SEPA violated

24    the lockup provision.  I note that Ideanomics, in its briefing

25    and at the hearing last week, has not meaningfully contested

1    that such transactions took place.  Today, counsel for

2    Ideanomics proffered that, regrettably, of the $3,482,500 that

3    it received from the transaction with YA under the SEPA, there

4    are no such funds remaining in its possession, custody, or

5    control.  The Court had hoped that such funds would be

6    available that could be put aside to help protect Acuitas'

7    interests.  However, Ideanomics' counsel proffered today that

8    all such funds had been expended as of the Court's order at the

9    March 31 hearing.  Nonetheless, for avoidance of doubt, in the

10   event that, on further review, such proves factually incorrect

11   and that funds traceable to transactions under the SEPA come to

12   light, they are to be placed in escrow.

13          That leaves the transactions under the amended SDPA

14   and from any convertible debentures with YA pursuant to it.  I

15   am persuaded that the nature of transactions under the amended

16   SDPA is such that these do not have a dilutive quality.  I rely

17   here on Ideanomics' opposition and the Form 8-K filing that it

18   attaches.  The Form 8-K states that the amended SDPA was

19   further amended on April 4, 2023 "to remove any reference to

20   convertible features," meaning that the "debenture is no longer

21   convertible into the company's common stock, or any of the

22   company's issued and outstanding stock."  Accordingly, debt

23   financing from YA, pursuant to the amended SDPA, is not

24   convertible to shares of Ideanomics' capital stock and is not

25   prohibited by the lockup provision that the parties negotiated.

1          Also, accordingly then, the Court declines to modify

2     the injunction to require Ideanomics to hold in escrow funds

3     that it may receive in the future through the amended SDPA and

4     from any further questionable debenture with YA.  I therefore

5     deny the proposal to modify the escrow provision to treat

6     proceeds of future transactions under the amended SDPA and

7     convertible debentures as violative.

8          That said, there is the $313,000 that Ideanomics,

9     pursuant to the Court's March 31, 2023 order, put in escrow

10    from the recent transaction with YA, pursuant to the amended

11    SDPA and convertible debenture, pending briefing on whether

12    that transaction was unlawful.  It is now clear to the Court

13    that that transaction was not dilutive and was not prohibited.

14    Nonetheless, money is fungible and the Court is committed,

15    where such is consistent with the balance of equities, to take

16    action to help assure the availability of a remedy for Acuitas.

17    Therefore, because Ideanomics had already spent the more than

18    $3.4 million in fruits of its prohibited transaction with YA,

19    the Court will require Ideanomics to continue to hold in escrow

20    the sum, estimated at $313,000, that represents fruits of its

21    lawful debenture transaction with YA.  The balance of equities

22    favors this measure, as there is tangible benefit to Acuitas,

23    which faces a real risk of having no monetary remedy available

24    to it, and there has been no showing of harm to Ideanomics

25    sufficient to offset that benefit.  I will therefore add a

 1    sentence to paragraph 6 that reads:  "In addition, the money

 2    held in escrow as of the date of this order, which derives from

 3    transactions pursuant to the amended SDPA debenture, shall

 4    remain in escrow, for the benefit of Acuitas."

 5             I turn now to Acuitas' proposed modification of

 6    paragraph 4.  Acuitas proposes to extend the lockup period to

 7    June 19, 2023.  It also proposes to specify that transactions

 8    pursuant to the SEPA, amended SDPA, and convertible debenture

 9    are prohibited during the lockup period.  The application to

10    modify this provision presents a closer question, and the

11    Court, again, grants in part and denies in part the

12    modification.

13             As to the request to modify the lockup provision to

14    specify transactions under the SEPA, the Court grants the

15    modification, for the reasons just stated.

16             However, the Court denies the remainder of the

17    proposed modification.  The request to add references to the

18    amended SDPA and convertible debenture is denied.  That is

19    because those transactions, as structured today, do not

20    anticipate or empower the issuance of stock.  They, thus, do

21    not violate the lockup provision.

22             The Court also denies Acuitas' application to extend

23    the lockup period to June 19, 2023.  Acuitas reasons as

24    follows.  Ideanomics' breach of the SAP, it argues, denied

25    Acuitas the "full benefit" of the lockup provision.  That is

because Ideanomics breached, on or about March 14, 2023, that

is, 48 days into the period, by entering into a dilutive

arrangement with YA.  To give Acuitas a fresh 90-day period in

which there would be no dilution, save as authorized by the

lockup provision, Acuitas proposes to extend the lockup

provision to end on June 19 rather than to end on May 2.

Acuitas cites cases in which courts have extended noncompete

agreements upon the breach of such covenants.  Acuitas further

argues that extending this period will give it more time to

sell the shares it has with less of a risk that the issuance of

new shares will dilute the value of its shares.  Ideanomics

opposes on various grounds.  One is that the SPA does not

specify the temporal extension of the lockup period as the

appropriate remedy for a contractual breach.  Ideanomics also

argues that the balance of the equities favors permitting

Ideanomics to secure financing after the May 2, 2023

end-of-the-lockup period.  It argues that it is already making

capital-raising plans and that extending the lockup for 48 days

would seriously inhibit its ability to stay afloat.  To these

arguments may also be added that insofar as the issuance of new

shares after May 2 will bring in needed infusion of capital

into Ideanomics, such would tend to fortify the company's

prospects in a way that may offset or more than offset the

dilutive effect of the issuance of new shares.

          Although responsible arguments have been made in both

directions, the Court, relying on the balance-of-equities

component of the test for preliminary injunctive relief, finds

that Ideanomics has the better of the argument here.  At the

threshold, the provision in the SPA that states that any breach

of its obligations constitutes irreparable harm means only that

breach of the lockup provision lends itself to the possibility

of equitable relief.  It does not state what the injunctive

remedy should be.  It does not necessarily justify a

day-for-day extension of the lockup period.  That is really a

factual question.  And on the facts proffered, I find that such

an extension would be a simplistic response, and potentially an

ill-tailored response, to the harm alleged here.

Acuitas absolutely has a strong and legitimate

interest in preserving the benefit of its bargain with

Ideanomics.  It bargained to be able to exercise its conversion

rights and maintain its stake in the company, without the risk

of dilution to its shares.  That risk has been injured by

Ideanomics having breached the lockup period through its

transaction with YA under the SEPA.  That dilutes Acuitas'

stake in the company.  Acuitas also appears to have been

injured by the delay in the receipt of its converted shares.

That cost it the opportunity to sell such shares earlier, at a

higher price and over a more extended period of time.  The

Court has attempted to remedy that injury, albeit likely only

in modest part, by requiring Ideanomics to hold in escrow any

proceeds from that sale and any others made in violation of the

lockup provision, which runs until May 2, and, as I just

discussed, requiring it to hold in escrow the additional

proceeds of the debenture transaction under the amended SDPA,

even though that transaction proved not to be violative.  The

funds in escrow may prove useful in providing some financial

remediation.  And because Ideanomics has been enjoined from

violating that provision, were it to do so again, in other

words, to engage in a prohibited dilutive transaction between

now and May 2, not only would it be obligated to put the full

proceeds of that transaction in escrow for Acuitas, it would

also be in contempt of a court order, with all of the

consequences that may follow.

          And the Court is open to a future application for

injunctive relief.  Acuitas is invited to propose additional

steps under which Ideanomics would set aside more money for the

benefit of Acuitas upon a showing that such sums were necessary

to achieve a proportionate remedy for the harm from Ideanomics'

breach.  In considering such an application, the Court would

find it of value to receive a more concrete damages analysis

from Acuitas than it has thus far received, so as to enable the

Court to better understand Acuitas' estimation of the monetary

harm it believes it has experienced that may prove incapable of

remediation.

          But extending the lockup period by 48 days is a step

of a different character.  It would treat Acuitas' interest in

installing an uninterrupted 90-day period of no dilution as

dispositive.  It would treat the existence of a standstill of

that length as the key benefit for which Acuitas bargained.  As

such, because Ideanomics breached 48 days in, it would

effectively create a 138-day lockup period tarred by one

exception:  The YA transaction under the SEPA.  That is not

sensible.  It would not, by any means, achieve anything

concrete for Acuitas, save to give it huge leverage and

bargaining power over Ideanomics between May 2 and June 19,

leverage it presently does not have, or at least to that

degree.  And it could stand to prevent Ideanomics from

undertaking a panoply of dilutive transactions which, under its

agreement, it was entitled to engage in after May 2., and it

could, as Ideanomics suggests, paralyze the company from

getting the liquidity after May 2 that it needs to stay alive.

On the limited record before me, I find that the

potential existential harm to Ideanomics outweighs the nebulous

justifiable benefit to Acuitas.  Put a little differently, not

all 90-day periods are the same, and restarting the 90-day

clock on or about March 14 would put in place relief that is

formally or superficially appealing but is desensitized to the

economic reality of the situation.  It is blind to the amount

of the dilution that the violative transaction caused, it is

blind to the amount of money set aside for Acuitas to help

remedy that harm, and it is blind to the potentially fatal harm

that a standstill on equity-based fund raising could do to

Ideanomics and its owners.  The Court, in fashioning a

temporary remedy, above all, seeks not to do harm.  I am

unpersuaded that a 48-day extension of the lockup would not, on

balance, do harm.

Accordingly, the Court denies the request to extend

the lockup period.  Acuitas has shown irreparable harm and it

has shown a likelihood of success on the merits.  It may well

be entitled to a greater remedy than the one as yet imposed,

which involves a limited escrow of funds, but the balance of

equities disfavors extending the lockup by 48 days.

Let me conclude with this.  The Court remains

solicitous of Acuitas' interests under the SPA.  The Court is

opening to considering other relief, such as setting aside

additional funds for Acuitas, on a showing that such would

assure of it of a remedy for the existing breach that may not

be otherwise available if Ideanomics goes under.  The denial

today is, thus, without prejudice to Acuitas' right to pursue

alternative equitable relief.  I will not set a firm deadline

for any such application or require that there be one.  But

upon such an application by Acuitas for additional relief, I

would again expect to act quickly, and Ideanomics should expect

to file a response within, at the most, three business days.

Therein ends the ruling.

1              What I am going to do is hand out for counsel the

2    proposed amended order, I think I have captured every addition

3    that I have made, and give you a couple of minutes just to

4    review it to make sure there isn't some draftsman's error, but

5    I'm not inviting reconsideration.

6              MR. BORDETSKY:  Your Honor, may I address a separate

7    point.

8              I sent in a letter after the first -- after the 31st

9    with respect to the answer, moving it to May 5.  It was on

10   consent.  We just didn't get a response from the Court.  I know

11   the Court is weighed down with other matters.  I think it was

12   ECF number 48.  I just want to raise it to the Court.

13             THE COURT:  You've agreed on consent that the answer

14   should be adjourned until May 5?

15             MR. BORDETSKY:  Thank you.

16             THE COURT:  That's what you have agreed?

17             MR. BORDETSKY:  Yes.  To answer or otherwise respond.

18             THE COURT:  I will grant that today.

19             MR. BORDETSKY:  Thank you.

20             THE COURT:  In any event, you can bank on the granting

21   even if it doesn't hit ECF today.  It's a partial holiday and

22   ECF is shutting down early.

23             Granted.

24             MR. KRATENSTEIN:  Thank you.

25             THE COURT:  Take a look right now just at the order in

1     case there is some technical glitch.

2               Mr. Kratenstein, any glitch?

3               MR. KRATENSTEIN:  Not a glitch, although one small

4     request, given your admonition at the beginning of the hearing,

5     on the escrow.

6               We would just ask, and I hope opposing counsel won't

7     object to this, that they provide some evidence that the funds

8     have been escrowed.

9               THE COURT:  I am not going to put that in the court

10    order, but just as a matter of professional courtesy, would you

11    do that, please?

12              MR. BORDETSKY:  Yes.  I wanted to wait.  Can we have

13    that as an attorneys' eyes only?

14              THE COURT:  Why?

15              MR. BORDETSKY:  If there are financial aspects --

16              THE COURT:  Here is the short answer:  Yes.  Without

17    prejudice to Mr. Kratenstein's right to, upon reviewing it, say

18    to the Court:  On review there is nothing here that would be

19    problematic.

20              In other words, in the first instance, yes, just to

21    make this easy, so that he gets the confirmation.  But I have

22    every reason to expect, Mr. Bordetsky, your client can find a

23    way to get that confirmation that doesn't implicate other

24    interests, such as account numbers or market-moving

25    information.

1          But in the first instance, yes, just to get it done.

2          MR. BORDETSKY:  Thank you.

3          Conversely, I would ask that the Court, with respect

4     to plaintiff's obligation to hold the proceeds *pendente lite*

5     from the sale of the stock also be --

6          THE COURT:  Attorneys' eyes only.

7          MR. BORDETSKY:  Attorneys' eyes only.

8          THE COURT:  Sure.  What's good for the goose is good

9     for the gander.

10          With that, other than that, the order is fine, right?

11          MR. KRATENSTEIN:  Yes, your Honor.

12          THE COURT:  Mr. Bordetsky.

13          MR. BORDETSKY:  Yes, your Honor.

14          THE COURT:  I am going to sign the order.  I take it

15     you'll need, as last week, a copy of the signed order for your

16     clients?

17          MR. KRATENSTEIN:  If your Honor would not mind posting

18     it to ECF, yes.

19          THE COURT:  We certainly will.  The only issue is

20     because it's -- I think the docketing staff may or may not be

21     leaving early.  I am not sure.  Why don't I have my law clerk

22     bring a copy to you downstairs.

23          MR. KRATENSTEIN:  Thank you.

24          MR. BORDETSKY:  Your Honor, if it could be emailed, as

25     it was before --

1              THE COURT:  That's fine.  Even better.

2              MR. BORDETSKY:  It can be emailed so we can send it to

3    our respective clients?

4              THE COURT:  Even better.

5              Let me just say this.  This is a challenging problem.

6    I think you can all tell.  Like you, I'm trying to work my way

7    through it.

8              There is also an issue lurking out here, which is, if

9    Ideanomics were to go bankrupt, I wouldn't want the money that

10   I have had set aside, whether the 313 or something larger,

11   suddenly being lost -- its benefit lost to Acuitas.  That

12   occurred to me during the hearing today.  I'm not a bankruptcy

13   scholar, but I would encourage you to think about whether there

14   is some manner in which that money could be held, including

15   having Acuitas holding it in escrow, or something like that.

16   To the extent there is some solution here that may have some

17   beneficial consequence, I'd love for all of you to think about

18   that.  That emerges as an issue.

19             Again, what I'm really trying to do is, recognizing

20   the risk of irreparable harm if Ideanomics goes under, trying

21   to create a pool that at least provides some damage protection.

22   I welcome your thinking about it.

23             More generally, I would like you to all work together

24   on this.  I am trying not to interfere with the efforts to

25   survive and thrive that Ideanomics had.  That's ultimately

1  better for everybody.

2          But at the same time it appears to me at first blush

3  that the amount of money that's put in escrow, although the

4  damage modeling is very complicated here, I can tell, it

5  appears at first blush unlikely to capture the plausibly

6  alleged harm that Acuitas would likely be able to contend it

7  has suffered if events play out badly.  I would like to find a

8  way, as a matter of constructive problem solving, to have more

9  and more up to some point of reason that is consistent with

10  some defensible damages model, put aside in a way that's

11  available just to protect their interests.

12          In the first instance, it would be great if counsel

13  could speak about that.  I could continue to referee these

14  disputes, and I'm here for that and I'm happy to do it and it's

15  a pleasure to have great lawyers and a challenging problem, but

16  your clients are spending money on you to do that.  If you are

17  able to come up with some workaround, that would be best.

18          With that, can I see counsel at sidebar off the

19  record.

20          (At sidebar; discussion off the record)

21          (Adjourned)

22

23

24

25